James NEAL, Director, Committee on Professional Conduct *v.* Perlesta Arthur HOLLINGSWORTH

98-1456 992 S.W.2d 771

Supreme Court of Arkansas
Opinion delivered June 24, 1999
[Petition for rehearing denied September 9, 1999.]

*Everett & Mars*, by: *David D. Stills* and *John C. Everett*, for appellant.

*Darrell F. Brown & Associates*, by: *Darrell F. Brown*, for appellee.

ANNABELLE CLINTON IMBER, Justice. The appellant, James A. Neal, in his capacity as Executive Director of the Committee on Professional Conduct, filed a complaint for disbarment against the appellee, Perlesta A. Hollingsworth, alleging numerous violations of the Model Rules of Professional Conduct. The trial court dismissed certain allegations contained in Paragraph 10(b) of the complaint due to lack of notice and then proceeded to conduct a bifurcated hearing on the remaining allegations in Mr. Neal's complaint. The first phase of the hearing pertained to the issue of whether Mr. Hollingsworth had violated any of the Model Rules and the second phase pertained to the issue of sanctions. Based upon the evidence presented during the hearing, the trial court found that Mr. Hollingsworth violated the

Model Rules of Professional Conduct and ordered that Mr. Hollingsworth be suspended from the practice of law for a period of six months. Mr. Neal now appeals the trial court's decision, asserting that disbarment was the appropriate sanction and that the trial court erred in dismissing certain allegations in the complaint. We reverse and remand.

In January, 1987, Mr. Hollingsworth commenced the representation of the Estate of Samuel S. Sparks, deceased, in a probate proceeding in Woodruff County, Arkansas. On June 1, 1987, Mr. Hollingsworth sent a letter to Mrs. Joyce Sparks, Mr. Sparks's widow and the executrix of his estate, that confirmed the fee arrangement for representing the estate. Specifically, Mr. Hollingsworth's law firm would charge for services to the estate in accordance with the schedule set forth in the Arkansas Probate Code "unless special or unusual services to the estate are required" and would bill the estate periodically for costs and out-of-pocket expenses. In connection with probating the Sparks estate, Mr. Hollingsworth undertook to "prepare and present to the probate court all necessary notices, petitions, orders, appraisals, bills of sale, deeds, leases, contracts, agreements, inventories, financial accounts, reports, and all other proper and necessary legal instruments during the entire six (6) months, or longer when necessary, while said estate is required by law to remain open." The letter also referenced the collection of certain notes receivables due to the estate as involving "special or unusual services anticipated in connection with administering the estate" and established a special contingency-fee arrangement, which was twenty-five percent of any funds collected on the notes. No other special matters or fees were noted, and there was no reference to hourly billing for any matters.

At the time Mr. Hollingsworth negotiated the fee arrangement for representing the estate, he was aware that other matters existed in connection with his representation of the estate. These included a determination-of-heirship claim and claims by creditors on two promissory notes that were endorsed or guaranteed by Samuel Sparks. Mr. Hollingsworth also instituted a wrongful death action against Dave's House of Guns in 1988. No fee arrangements were reduced to writing for any of these matters.

After commencing representation of the Sparks estate, Mr. Hollingsworth successfully defended the determination-of-heirship claim by Ms. Shirley Hodges and represented the estate in two lawsuits filed in federal district court by the Small Business Administration and Planters Bank and Trust Company to recover $144,809.38 and $119,498.16, respectively, on the promissory notes guaranteed by Mr. Sparks. Mr. Hollingsworth also filed several lawsuits on behalf of the estate. He obtained a judgment against Mr. Warren Barge for $10,000.00 and represented the estate in an unsuccessful claim against Mr. Bobby Smith. The estate's wrongful death action against Dave's House of Guns went to trial but ultimately culminated in a directed verdict in favor of the defendant. Finally, with regard to the notes receivables that were the subject of the special fee arrangement, Mr. Hollingsworth filed two separate lawsuits in federal district court in 1997. In the first lawsuit, the Sparks estate sued Mr. James M. Griffin to collect $100,000.00 that Mr. Griffin owed Mr. Sparks on a promissory note. In the second lawsuit, the estate sued Mr. Griffin and the United National Bank of Washington, D.C., to secure the release of a $100,000.00 certificate of deposit that Mr. Sparks had given as collateral on a loan to Mr. Griffin by United National Bank.

While representing the estate, Mr. Hollingsworth collected various funds belonging to the estate. When the $100,000.00 certificate of deposit was released by United National Bank in 1988, Mr. Hollingsworth deducted his twenty-five percent contingency-fee of $25,000.00 and gave the balance of $75,000.00 to Mrs. Sparks. All other estate funds collected by Mr. Hollingsworth were deposited into his firm's trust account. Those funds included $5000.00 for a retainer fee, $1,640.60 for expenses, $8,500.00 derived from the sale of a Lincoln automobile and $136,235.77 recovered over a two-year period (May 1987 – May 1989) on the Griffin promissory note. Mr. Hollingsworth maintained that these monies were placed in his firm's trust account in order to facilitate the payment of litigation expenses incurred by the estate. Some of those expenses were in fact paid out of the firm's trust account. Although Mr. Hollingsworth suggested that Mrs. Sparks agreed to this arrangement, she testified otherwise.

For several years, Mrs. Sparks thought that the estate's funds were being held in a separate estate account. Only after she began to make persistent inquiries about the estate's account did Mrs. Sparks learn from Mr. Hollingsworth that the estate's funds were being held in his firm's trust account.

Mrs. Sparks's inquiries about an accounting of the estate's funds began in 1992. On February 10, 1992, she wrote a letter to Mr. Hollingsworth requesting a statement of expenses incurred by the estate for the year 1991 and a statement of the money being held in the "Estate trust account." When no accounting was forthcoming after several months, Mrs. Sparks wrote another letter in November of 1992. In fact, the record reflects that Mrs. Sparks wrote almost twenty letters between 1992 and 1994 asking for an accounting. Mr. Hollingsworth never directly responded to her request for an accounting. Rather, his letters to Ms. Sparks during that time period were merely status reports on the litigation being pursued by the estate. Mrs. Sparks's letters also reflect that Mr. Hollingsworth made repeated excuses for failing to provide an account of the estate's funds. For instance, when Ms. Sparks visited his office in November 1992, he informed her that the estate files were not on his computer because the estate was opened before his office acquired computers. On another occasion in 1993, he told Mrs. Sparks that his former secretary destroyed part of the estate's files when she quit working for him. Mr. Hollingsworth also told Mrs. Sparks that the accounting was "in the mail."

Ms. Sparks continued to request, and then to demand, access to the records for the estate's trust account. Finally, in May, 1993, when Mrs. Sparks discovered that the estate funds were being held in the law firm's trust account and not in a separate account, she expressed concern "especially since you have admitted to me that you have not kept accurate records." Mrs. Sparks's letters also reflect that Mr. Hollingsworth never sent her an itemized fee statement and that he unilaterally and without notice charged her hourly rates. She repeatedly asked Mr. Hollingsworth for some indication of when the estate could be closed, noting in her letters that the estate had been open for over five years.

Mrs. Sparks never denied that Mr. Hollingsworth performed valuable services for the estate. Nor did she ever accuse him of stealing. However, the many letters she wrote to Mr. Hollingsworth vividly conveyed her building frustration with the manner in which he was handling the estate's affairs. On July 15, 1994, Ms. Sparks terminated Mr. Hollingsworth's services as the attorney for the estate. She further advised him that she had filed a formal complaint against him with the Supreme Court's Committee on Professional Conduct.

Even before his services were terminated in July 1994, Mr. Hollingsworth had been notified by letter dated March 7, 1994, that Mrs. Sparks had contacted the Committee's office. Mr. Hollingsworth filed a response in the form of an affidavit on May 19, 1994. The Committee then began to investigate Mr. Hollingsworth's representation of the Estate of Samuel Sparks. During the two-year investigation, Mr. Hollingsworth provided the Committee with canceled checks, deposit slips, correspondence, explanations of expenses, and a computer printout of bank statements on his firm's trust account, all in response to the Committee's requests for all documents and information pertaining to the Sparks estate.

The Committee's investigation revealed that Mr. Hollingsworth failed to keep accurate records on the estate's funds and expenditures. Specifically, the trust account checks that Mr. Hollingsworth produced to document estate expenses were made payable either to third parties or to the Hollingsworth law firm's operating account. Other than Mr. Hollingsworth's written explanations in a letter to the Committee, there was little, if any, documentary proof, such as invoices or receipts, that the canceled checks were for expenses attributable to the Sparks estate. Some checks, especially those made payable to a court clerk, process server, court reporter, or expert, contained a specific reference to the Sparks estate. However, other checks made payable to credit card companies, common carriers, or the firm's operating account, contained no specific reference to the Sparks estate. Although Mr. Hollingsworth testified at the disbarment proceeding that his attorney's fees were paid out of the firm's trust account, he admitted that he could not locate or produce any trust

account checks to support that assertion. He also conceded during the disbarment proceeding that checks were written on the firm's trust account to make other clients "whole" when his firm suffered serious shortfalls after a former partner misappropriated substantial funds from the law firm's accounts. Although Mr. Hollingsworth did not produce canceled checks to document this testimony, it is clear from a compilation of bank statements on the firm's trust account that the canceled checks provided to the Committee by Mr. Hollingsworth were a mere fraction of the checks written on the firm's trust account between 1987 and 1994.

Based upon the documentation provided by Mr. Hollingsworth, the Committee made a comparison of balances in the Sparks estate with balances in the firm's trust account beginning in February 1987 and ending in November 1994. Beginning in late 1987, the trust account balance was consistently below the balance in the estate. By November 1989, the estate's balance reached $107,888.07 and stayed at that level through November 1994. However, the trust account balance for that five-year period always remained well below the estate's balance. In fact, the balance in the trust account went as low as $186.21 in October, 1991, when the Sparks estate should have had a balance in the trust account of $107,888.07.

On September 20, 1996, Mr. Neal filed a complaint for disbarment against Mr. Hollingsworth in which he alleged numerous violations of the Model Rules of Professional Conduct. The complaint not only included allegations concerning Mr. Hollingsworth's handling of the Sparks estate, but also added a charge concerning another client in a separate matter. With regard to the added charge, Mr. Neal alleged that Mr. Hollingsworth failed to disclose his relationship with an attorney who had been appointed guardian ad litem for the minor child in a divorce proceeding in which he was representing the child's father. The trial court granted Mr. Hollingsworth's motion to dismiss this added charge on grounds of lack of notice.

The hearing on Mr. Neal's complaint for disbarment was held on August 6–8, 1998. During the violations phase of the

bifurcated hearing, Mr. Neal presented his case-in-chief through the testimony of Ms. Leslie Fryxell, staff attorney for the Committee, Mrs. Joyce Sparks, and Mr. Hollingsworth and through the introduction of several exhibits. Mr. Hollingsworth's defense included his own testimony and that of his associate, Michéle Strauss.

During the sanction phase of the bifurcated hearing, Mr. Hollingsworth presented mitigating evidence through the testimony of Judge Marion Humphrey, Judge Robert Faulkner, Senator William L. Walker, Jr., and Rev. Steven Arnold, with each witness attesting to Mr. Hollingsworth's reputation for integrity and good character. Mr. Hollingsworth testified that in almost thirty years of practice he had never been cited for a violation of the Model Rules. He also expressed his intention to make complete restitution to Mrs. Sparks. While conceding only a "technical violation" of the Model Rules, he expressed remorse and regret, stating that he was sorry this had happened. Mr. Neal rested on the evidence of aggravating factors already contained in the record.

By order entered on August 24, 1998, the trial court found that Mr. Hollingsworth violated Rules 1.1, 1.3, 1.4(a), 1.5(a)(b), 1.15(a)(b)(c), 3.2, 4.1, and 8.4(c)(d) of the Model Rules of Professional Conduct. In connection with its duty to determine the appropriate sanction for the listed violations, the trial court made specific findings regarding the aggravating and mitigating circumstances before concluding that Mr. Hollingsworth should be suspended from the practice of law for a period of six months. The trial court also required that Mr. Hollingsworth reapply with the Committee for reinstatement to the practice of law. Mr. Neal now appeals the trial court's decision, asserting that the sanction should have been disbarment and that the trial court erred when it dismissed the added charge against Mr. Hollingsworth involving another client in a separate matter. Neither party appeals the trial court's specific findings regarding rule violations or aggravating and mitigating circumstances.

*I. Whether the Trial Court Erred When It Imposed a Six-Month Suspension From the Practice of Law in a Bifurcated Disbarment Proceeding.*

*A. Determination of Proper Standard of Review*

 Disciplinary proceedings are neither civil nor criminal but are *sui generis*, meaning of their own kind. *See* Procedures of the Ark. Sup. Ct. Regulating Prof. Conduct of Attorneys at Law, Section 1(C); BLACK'S LAW DICTIONARY 851 (6th ed. 1990). The standard of review that governs appeals from disbarment proceedings is clearly articulated in Section 5(L)(4) of the Procedures of the Arkansas Supreme Court Regulating Professional Conduct of Attorneys at Law:

> (4) Appeals from any judgment of a Circuit court in a disbarment proceeding shall be heard in accordance with the rules governing appeals in civil cases.

These Procedures were originally adopted by the Supreme Court by *per curiam* order dated July 1 of 1990. They have been amended by *per curiam* order dated January 8, 1998, and effective January 15, 1998. The language in Section 5(L)(4) is identical in both versions of the Procedures, although Section 5(L)(4) was formerly numbered Section 5(H)(4).

 Disbarment proceedings are tried by the circuit court without a jury. Procedures, Section 5(K)(1), formerly Section 5(G)(1). Under the Arkansas Rules of Civil Procedure, the standard of review on appeals from bench trials is whether the trial judge's findings were clearly erroneous or clearly against the preponderance of the evidence. *See* Ark. R. Civ. P 52(a); *McQuillan v. Mercedes-Benz Credit Corp.*, 331 Ark. 242, 961 S.W.2d 729 (1998); *Ford Motor Credit Co. v. Ellison*, 334 Ark. 357, 974 S.W.2d 464 (1998). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Wade v. Arkansas Dept. of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999); *AD-Razorback Ltd. Partnership v. B.G. Coney Co.*, 289 Ark. 550, 713 S.W.2d 462 (1986). The court must view the evidence in a light most favorable to the

appellee, resolving all inferences in favor of the appellee. *Id.* Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. *Id.*

Applying the clearly erroneous standard of review mandated by Section 5(L)(4) of the Procedures, we now consider Mr. Neal's assertion that the trial court erred when it imposed a six-month suspension from the practice of law instead of disbarment.

## B. *Appropriateness of Trial Court's Sanction.*

The purpose of disciplinary actions is to protect the public and the administration of justice from lawyers who have not discharged their professional duties to clients, the public, the legal system, and the legal profession. *See American Bar Association Model Standards for Lawyers Sanctions* § 1.1 (1991). In Arkansas disbarment proceedings, if the trial court finds that an attorney has violated the Model Rules of Professional Conduct, then the trial court "shall caution, reprimand, suspend or disbar such attorney as the evidence may warrant." Procedures, Section 5(K)(2), formerly 5(G)(2). With regard to whether the evidence warrants suspension or disbarment, Section 7 of the Procedures divides violations of the Model Rules into two separate categories of misconduct: serious misconduct and lesser misconduct. Procedures, Section 7(B) and (C).[1] Serious misconduct warrants a sanction terminating or restricting the lawyer's license to practice law, whereas lesser misconduct does not. *Id.* Conduct will be considered serious misconduct if any of the following considerations set forth in Procedure Section 7(B) apply:

(1) The misconduct involves the misappropriation of funds;

(2) The misconduct results in or is likely to result in substantial prejudice to a client or other person;

(3) The misconduct involves dishonesty, deceit, fraud, or misrepresentation by the lawyer;

(4) The misconduct is part of a pattern of similar misconduct;

---

[1] Section 7(B) and (C) were added to the Procedures in the amendments adopted by *per curiam* order dated January 8, 1998, and effective January 15, 1998.

(5) The lawyer's prior record of public sanctions demonstrates a substantial disregard of the lawyer's professional duties and responsibilities; or

(6) The misconduct constitutes a "serious crime"[2] as defined in the Procedures.

Likewise, when the trial court finds that the Model Rules have been violated by either serious or lesser misconduct, the trial court must proceed to the penalty phase during which the defendant attorney and the Committee's Executive Director are allowed to present evidence and arguments regarding aggravating and mitigating factors in order to assist the trial court in making its determination of the appropriate sanction. *Wilson v. Neal*, 332 Ark. 148, 964 S.W.2d 199 (1998). Those factors developed by the American Bar Association Joint Committee on Professional Standards and adopted by this Court in *Wilson* are:

Aggravating Factors:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with the rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge [the] wrongful nature of [the] conduct;

---

[2] "Serious crime" is defined in Procedure Section 1(E)(8) as follows:
(8) "SERIOUS CRIME" means any felony or any lesser crime that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, or any crime a necessary element of which, as determined by the statutory or common law definition of the crime, involves interference with the administration of justice, false swearing, misrepresentation, fraud, deceit, bribery, extortion, misappropriation, theft or an attempt, conspiracy or solicitation of another to commit a "serious crime."

(h) vulnerability of [the] victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution;

(k) illegal conduct, including that involving the use of controlled substances;

Mitigating factors:

(a) absence of prior disciplinary record;

(b) absence of dishonest or selfish motive;

(c) personal or emotional problems;

(d) timely good faith effort to make restitution or to rectify [the] consequences of [the] misconduct;

(e) full and free disclosure to [the] disciplinary board or cooperative attitude towards [the] proceedings;

(f) inexperience in the practice of law;

(g) character or reputation;

(h) physical disability;

(i) mental disability or chemical dependency including alcoholism or drug abuse when

 (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

 (2) the chemical dependency or mental disability caused the misconduct;

 (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation;

 (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j) delay in [the] disciplinary proceedings;

(k) impositions of other penalties or sanctions;

(l) remorse;

(m) remoteness of prior offenses.

*Wilson, supra.* Additionally, the Procedures now identify the following factors as appropriate for the Committee's consideration in determining the sanction to be imposed:

- The nature and degree of the misconduct.

- The seriousness and circumstances surrounding the misconduct.

- The loss or damage to clients.

- The damage to the profession.

- The assurance that those who seek legal services in the future will be protected from the type of misconduct found.

- The profit to the lawyer.

- The evidence of reputation.

- Whether the conduct was deliberate, intentional, or negligent.

- The deterrent effect on others.

- The maintenance of respect for the legal profession.

- Matters offered by the lawyer in mitigation or extenuation.

*See* Procedures, Section 7(F) adopted by *per curiam* Order dated January 8, 1998.. While these factors are not classified as either aggravating or mitigating circumstances, we believe they are harmonious in their objectives and their focus with the factors adopted in *Wilson II.*

During the penalty phase in this disbarment proceeding, Mr. Neal presented no evidence, opting instead to rest on the evidence already in the record from the first phase of the hearing. This is reflected in the following colloquy between the trial court and counsel:

> THE COURT: The burden is on the court for me to consider whatever evidence you gentlemen want to put on in regard to those two [sets of] factors. I'm not sure who has the burden.

> MR. BROWN: It's my position that the Committee has the burden. The standards address two [sets of] factors, that is, aggravating and mitigating . . . . [I]t seems to me that they have the burden of proof of establishing the violation, they would have the burden of proof of trying to convince the court what the appropriate sanction is.

> THE COURT: Any aggravating factors they wanted me to consider that are not already in the record, I'm not sure anything further is necessary in a case, it's whatever you lawyers feel.

> MR. EVERETT: If I have the burden, I do not offer evidence as the offeror in Phase Two. I may do some cross-examination, if I have the burden, I yield.

> THE COURT: You are resting in both phases?

> MR. EVERETT: Except, as the Court said, whatever evidence is in the record, yes, sir, I'm resting in both phases.

Mr. Hollingsworth proceeded with the presentation of mitigating evidence. In that regard, Mr Hollingsworth testified that he had been in practice for almost thirty years without any prior caution or reprimand by the Committee. He also testified that he was deeply sorry for what had happened, and that he had no dishonest or deceitful motive in his actions with regard to the Sparks case. However, he conceded only to committing a "technical" violation of the rules and continued to assert that his actions had been undertaken in the belief that he was acting in the best interest of his clients. He testified that he had made restitution of all sums due to Mrs. Sparks, except for some interest which he intended to pay Mrs. Sparks and thereby make her whole again. Mr. Hollingsworth also admitted that he made payments out of the firm's trust account to make other clients "whole." Mr. Hollingsworth testified to his full cooperation with the Committee and to his promptness in responding to discovery requests. This was corroborated by Ms. Leslie Fryxell in her testimony during the first phase of the hearing.

With regard to his character and reputation in the community, Mr. Hollingsworth presented the testimony of several witnesses. Judge Marion Humphrey testified that he had known Mr. Hollingsworth for over twenty years and that during that time he

had formed the opinion that Mr. Hollingsworth was a diligent servant of the law with a good reputation in the community. Judge Humphrey also testified that Mr. Hollingsworth had taken on causes which contributed to the advancement of African-Americans within the judicial system in this state. Judge Robert Faulkner of the United States District Court, Eastern District of Texas, testified that he had known Mr. Hollingsworth for over thirty years. Mr. Hollingsworth was working as Governor Rockefeller's legal representative to the prison system when Judge Faulkner first became acquainted with him. Judge Faulkner testified that he was familiar with Mr. Hollingsworth's reputation for truthfulness and veracity and that his employment history with Governor Rockefeller corroborated that reputation because the position of legal representative to the prison system required someone with a good reputation for honesty. Judge Faulkner testified that Mr. Hollingsworth took on unpopular causes and that he was known as a champion for causes and an outstanding attorney. Judge Humphrey and Judge Faulkner both testified that Mr. Hollingsworth was still able to make a contribution to the community as an attorney in light of his reputation and character. Mr. Hollingsworth's pastor, Rev. Stephen Arnold, and Mr. Sparks's godson, Senator William L. Walker, Jr., both testified to Mr. Hollingsworth's reputation for honesty and integrity and to his sincerity.

By order entered on August 21, 1998, the trial court made the following findings pertaining to aggravating factors:

- That [Mr. Hollingsworth] entered into a written fee agreement regarding his representation of the estate of Sam Sparks, deceased, then pending in the Probate Court of Woodruff County, Arkansas. At the time of the agreement, three (3) claims had been filed against the Estate. Generally, the fee agreement called for the statutory fee plus a twenty-five percent (25%) contingency fee for the collection of notes and monies receivable by the Estate. The defendant was also to bill the Estate periodically for named costs.

- That the defendant did not file required annual accountings in the probate action nor did he send notices to interested parties appropriately. That, in the representation of the Estate of

Sam Sparks, the defendant acted almost entirely without obtaining the Probate Court's authority, treating the assets of the trust funds owned by the Estate as if they were his own.

- That, between November, 1989, and November, 1994, the Estate of Sam Sparks should have had a balance in the defendant's trust account of $107, 888.07 but the account had only a fraction of that sum and, at one point, in October 1991, the account had only $186.21.

- That the Court finds that the defendant knowingly diverted the funds of the Estate of Sam Sparks for his own use and did so over a period of time exceeding five (5) years. Further, the Court finds that his failure to file annual accountings in the probate action were due to the fact that his diversion of funds would have been discovered had such accountings been filed.

- That there is no basis in the evidence for the defendant's claim that the shortage of funds in his trust account was based on his belief that he could bill the Estate for hourly work on certain matters and the Court finds that the defendant's assertion to the contrary was an attempt to explain away the shortages in the account.

- At least by 1992, the Executrix of the Estate of Sam Sparks began to repeatedly ask the defendant for an accounting of the trust account funds but that the defendant stonewalled those requests. Only at the time he was fired did the defendant make an attempt to make restitution by sending Seventy Thousand 00/100 Dollars ($70,000.00) to the attorney substituting him.

- That the defendant was subsequently ordered by the Probate Court to pay the Estate of Sam Sparks the sum of Thirty Thousand and 00/100 Dollars ($30,000.00) and has now paid such sum in full excepting only for the accrued interest on such sum of money.

After listing these findings, the trial court found that, as a mitigating factor, Mr. Hollingsworth had "been in practice for almost thirty (30) years [sic] and has no prior disciplinary offense." Further, the trial court found that the evidence of extenuation and mitigation represented by the community leaders who testified on Mr. Hollingsworth's behalf was impressive and that the acts complained of were not a pattern of conduct.

The trial court considered the aggravating and mitigating factors before concluding that Mr. Hollingsworth should be suspended from the practice of law for six months. By imposing the sanction of suspension from the practice of law, the trial court recognized that Mr. Hollingsworth's conduct was serious and warranted "a sanction terminating or restricting . . . [his] license to practice law." Procedures, Section 7(B). Mr. Neal, however, strongly contends that the trial court's limited sanction does not match the seriousness of the misconduct committed and that the only appropriate sanction is disbarment.

In order to determine whether the trial court's imposition of a six-month suspension instead of disbarment was clearly erroneous, we review the trial court's specific findings regarding rule violations and aggravating and mitigating factors. First, the trial court found that Mr. Hollingsworth had treated the assets of the trust funds owned by the Sparks Estate as if they were his own and that Mr. Hollingsworth "knowingly diverted the funds of the Estate of Sam Sparks for his own use and did so over a period of time exceeding five (5) years." The trial court also found that between November 1989 and November 1994 the Sparks Estate should have had a balance of $107,888.07 in the trust account, but the trust account only had a fraction of that sum and at one point dipped as low as $186.21. Mr. Hollingsworth admitted that he used the estate's funds to pay claims against his law firm by other clients. When asked whether he would characterize his use of the estate's money as dishonest or selfish, Mr. Hollingsworth testified as follows:

> Q: Let me ask you, sir, if you would agree with me that if what you did was to take money out of your trust account, owned by the Estate of Sam Sparks, and used that money to pay claims of other clients, as you have described that you had done, don't you agree that is dishonest to use the estate's money to pay claims against your law firm by other clients, do you agree with that?
>
> A: I cannot characterize it as dishonest.
>
> * * *
>
> Q: Do you think it is selfish to use funds belonging to one client to pay claims lodged by another client, do you think that's selfish

to the extent that you are protecting your own self against those claims from other clients, do you think that's selfish?

A: I do not consider it selfish, I cannot characterize that by using that adjective.

Next, the trial court found that Mr. Hollingsworth did not file required annual accountings in the probate action because "his diversion of funds" would have been discovered. Similarly, when Mrs. Sparks, as executrix of the Sparks Estate, began to ask Mr. Hollingsworth in 1992 for an accounting of the trust account funds, he "stonewalled" her requests. The letters Mrs. Sparks wrote to Mr. Hollingsworth are particularly poignant. Mrs. Sparks was the victim of the misuse and clearly was kept in the dark about what was happening. What follows is a sampling from some of her many letters:

*November 26, 1992:*

If there is a reason you can't provide me with this information please let me know. I have requested this information several times in the past three years and have not received it and I am uncomfortable with your reluctance to provide me with an accounting of the money you are holding in trust for the Estate of Sam Sparks.

*December 18, 1992:*

There is still a misunderstanding regarding my concerns about the estate. When I met with you on October 6th, I left with the idea that you would give me a statement of the amount that is in the trust account the following week. When I didn't receive the statement I felt I needed to remind you that I was expecting one. Since I have not had a statement I can only guess at the amount and since I don't know how much the expenses were from the gun suit my estimate will be unenlightened. All I want is a bank statement or something similar.

*February 6, 1993:*

I am still waiting for the statement of the amount you are holding in the Estate of Sam Sparks . . . . I want access to all bank statements and canceled checks written on the Estate of Sam Sparks. Please have copies of these files available for me so I can pick them up on Thursday February 11th.

*February 15, 1993*:

> Your letter was disturbing to me because in November when I saw you in your office, after I had purchased a computer, you told me that the Estate files weren't on your computer since the Estate of Sam Sparks was opened before you got your office computers. Now you tell me that your former secretary destroyed part of the files when she quit working for you. The latest bank statement that you have received on the Estate of Sam Sparks trust account will be sufficient for now. I expect the rest of the bank statements, receipts for expenses and any other information concerning the trust account and other funds collected on the behalf of the Estate within the week following your receipt of this letter. If you cannot provide this information by Friday, please understand that I plan to make a claim against the law firm for negligence and malpractice.

*February 27, 1993*:

> I have been trying to get a statement from you of how much cash is in the account you are supposed to be holding in trust. I can't understand how this request is so difficult to fulfill when bank statements showing balances and debits should be easy for you to obtain.

> \* \* \*

> What I want from you is a bank statement showing the balance in the Estate account and when your records are complete, I expect a full accounting of your expenditures. I expect this by March 5th.

*April 5, 1993*:

> In your letter to me dated February 23, 1993, you said that the attorney client relationship had deteriorated to a point of complete distrust and breakdown, this is true because you have not provided me with the account of the Estate that I am entitled to and you have been telling me it is in the mail when no such report exists. Throughout our attorney–client relationship you have been telling me one thing when I meet with you and the complete opposite the next time we meet, as a result the question of credibility, trust and confidence has been lost.

> \* \* \*

I want the name of the bank or banks and the account numbers of all accounts where you have placed money belonging to the Estate of Sam Sparks immediately.

*April 19, 1993:*

There was no bank statement and canceled checks included in the information I received. I want to be provided with a copy of the latest bank statement for the account and copies of the canceled checks from the account used to pay expenses.

*May 3, 1993:*

I regret that my correspondence has caused you concern, however I have been concerned over the length of time you required to give me any form of accounting. None of this would have taken place if you had provided me with a statement following our meeting on October 6, 1992, as promised. If our roles were reversed I feel that you would not have been as patient as I have been.

Our phone conversation on Sunday also concerned me since I assumed the Estate of Sam Sparks account was separate from any others. When you told me that the account was in your firm's trust account and not in a separate account, I was very bothered, especially since you have admitted to me that you have not kept accurate records.

*November 29, 1993:*

In my letter to you dated October 21, 1993, I requested that you send my accountant all the expenses and fees you have deducted from the money you are holding that belongs to the estate. We have not received that information from you. I would like the balance of the money that belongs to the Estate of Sam Sparks placed in a separate account from your firm's trust account in a different bank.

I feel that you have taken advantage of our friendship ignoring my requests, making promises to me that you had no intention of keeping and charging me by either percentage or hourly whichever suited you best. I don't like the feeling of having to fight with the person I hired to protect my interests.

*January 18, 1994*:

> I think we must have different concepts of a full accounting because I haven't received what I would call one. I think a full accounting includes all expenses along with receipts and canceled checks, monies collected and interest earned.

*February 4, 1994*:

> . . . I don't know the amount of my entitlement or the value of the estate. The only way that can be accomplished is to do a final inventory and accounting, which I have been requesting for over a year. In your letter dated January 7, 1994, you stated that you had already given me a full accounting. Please send me a copy of that accounting.

*April 4, 1994*:

> I still want the accounting you said you were recapitulating sent to Holda Ward.

*April 18, 1994*:

> I want only the full accounting and the location of the bank where the estate funds are kept sent to Holda Ward.

When asked why he did not respond to Mrs. Sparks's letters, Mr. Hollingsworth testified as follows:

> A: I did respond to her letters, obviously, I did not give her the information that she wanted. How I missed that, I don't know . . . . I just didn't get the point that she was asking for an accounting until she hit me in the face with it.

With regard to restitution, the trial court found that no attempt to make restitution was made by Mr. Hollingsworth until after he was fired by Mrs. Sparks, which according to the record was in July 1994. Mr. Hollingsworth actually sent a cashier's check in the amount of $70,244.51 to her new attorney in February 1995, several months after the Committee began its investigation. The trial court also found that Mr. Hollingsworth was subsequently ordered by the probate court to pay the Estate an additional $30,000. The probate court's order was entered on August 26, 1997. At the time of the disbarment hearing in

August, 1998, Mr. Hollingsworth had paid the sum ordered by the probate court except for some accrued interest.

Finally, the trial court found that Mr. Hollingsworth violated the following Model Rules:

> Rule 1.1 — Competence
>
> Rule 1.3 — Diligence
>
> Rule 1.4(a) — Communication
>
> Rule 1.5 (a)(b) — Fees
>
> Rule 1.15 (a)(b)(c) — Safekeeping Property
>
> Rule 3.2 — Expediting Litigation
>
> Rule 4.1 — Truthfulness in Statements to Others
>
> Rule 8.4(c)(d) — Misconduct

Mr. Hollingsworth admitted on direct examination that he was "in a technical violation of one of the professional rules." When cross-examined about this testimony, Mr. Hollingsworth testified as follows:

> Q: Mr. Hollingsworth, you have described your misconduct as being in technical violation of the rules, that's the words you used early on in your testimony, and I want to know from you, if you believe that your misconduct is only technically in violation of the rules, or do you believe and can you tell the court that your conduct impacted the underpinnings of this profession, that it was much greater than a technical violation, that it was a substantive and egregious violation of the rules.
>
> A: I don't agree my conduct with [*sic*] an egregious violation of the rules, if I understand what the word egregious means.
>
> Q: It means awful bad, Mr. Hollingsworth, that's what I think it means.
>
> A: I don't think my conduct was awful bad.
>
> Q: Do you think it's fair to say that your conduct was only technically in violation of the rules, that it's a technicality you've been called in on?

A: No, I'm saying that there's a violation of the rules, I have violated the rules, I did not intend to violate the rules.

Q: I'm going to get to that. I just wonder why, when you were being examined by your lawyer, you described your conduct as a technical violation of the rules, I want to know if that was a misstatement or do you agree that it was much more than technical, it was substantial.

A: I don't agree with you it was substantial or egregious.

The trial court's findings with regard to mitigation include the fact that Mr. Hollingsworth had been in practice for almost thirty years without any prior disciplinary offense. The trial court found other evidence of extenuation and mitigation to be impressive. A number of community leaders came forward to attest to Mr. Hollingsworth's contributions to the advancement of African-Americans within the State's judicial system and to his reputation for integrity and good character.

Based upon our review of the evidence and the trial court's findings, we conclude that the record in this case supports the following aggravating factors:

(1) dishonest or selfish motive;

(2) a pattern of misconduct with respect to Mrs. Sparks;

(3) multiple offenses over more than five years;

(4) refusal to acknowledge the wrongful nature of the conduct;

(5) vulnerability of Mrs. Sparks;

(6) substantial experience in the law practice; and

(7) indifference to making restitution until fired and disciplinary investigation instituted.

We also conclude that the evidence supports the following mitigating factors:

(1) absence of prior disciplinary record;

(2) full cooperation with the Committee's investigation;

(3) character and reputation; and

(4) expression of remorse.

When these mitigating factors are compared to the trial court's findings that Mr. Hollingsworth knowingly diverted more than $100,000.00 of the Sparks Estate's funds to his own use over a period of five years and that he attempted to postpone discovery of that misconduct by failing to account to the probate court and by stonewalling Mrs. Sparks's requests for an accounting, we are left with a firm and definite conviction that the trial court committed a mistake when it imposed a short period of suspension from the practice of law. Mr. Hollingsworth's actions of misusing and misappropriating funds from the Sparks estate clearly come within four out of six considerations for "serious misconduct" under Section 7(B) of the Procedures. Notwithstanding ample proof that he violated numerous provisions of the Model Rules, the record unequivocally reflects that Mr. Hollingsworth does not recognize or appreciate the gravity and seriousness of his misconduct. The evidence in this case demonstrates a pattern of misconduct over the course of several years in which Mr. Hollingsworth misappropriated his client's funds and concealed his wrongdoing from the client and the court. This type of misconduct can only be characterized as serious, substantial, and egregious. Under these circumstances, we hold that the trial court clearly erred when it imposed a mere six-month suspension from the practice of law. The only appropriate sanction commensurate with Mr. Hollingsworth's actions is disbarment. The misconduct in *Weems v. Supreme Court Committee on Professional Conduct*, 257 Ark. 673, 523 S.W.2d 900 (1975), which involved less than $12,000.00 and lasted less than one year, certainly pales in comparison to the long-term pattern of misconduct here.

Other jurisdictions have also held that the intentional misappropriation of a client's funds and the misrepresentation of that fact to the client warrants disbarment. *See, e.g., People v. Torpey*, 966 P.2d 1040 (Col. 1998); *In the Matter of Barlow*, 140 A.2d 1197 (N.J. 1995); *In Matter of Wilson*, 409 A.2d 1153 (N.J. 1979); *In the Matter of Lake*, 236 S.E.2d 812 (S.C. 1977); *In the Matter of Nicholas Addams*, 579 A.2d 190 (D.C. Ct. App. 1990).

We conclude that Mr. Perlesta A. Hollingsworth should be, and hereby is, disbarred from the practice of law in the

State of Arkansas. Accordingly, we reverse and remand for entry of judgment consistent with this opinion.

## II. Whether The Trial Court Erred When It Dismissed The Added Charge Against Mr. Hollingsworth

For his second point on appeal, Mr. Neal asserts that the trial court erred when it dismissed the allegation concerning Mr. Hollingsworth's failure to disclose his relationship with an attorney who had been appointed guardian ad litem for the minor child in a divorce proceeding in which he was representing the child's father, Mr. Ted Skokos. In view of our holding that the only appropriate sanction commensurate with Mr. Hollingsworth's actions is disbarment, we need not address Mr. Neal's second point on appeal.

Reversed and remanded.