Mark Steven CAMBIANO *v.* James A. NEAL,
as Executive Director of the Supreme Court
Committee on Professional Conduct

00–283                                              35 S.W.3d 792

Supreme Court of Arkansas
Opinion delivered November 16, 2000
[Substituted Opinion on Denial of Petition for Rehearing
delivered December 15, 2000.]

*Jeff Rosenzweig*, for appellant.

*James A. Neal*, by: *Lynn Williams*, for appellee.

LAVENSKI R. SMITH, Justice. This is an attorney discipline case. Appellant Mark Cambiano appeals from an order of the Conway County Circuit Court dismissing his counterclaim. In his counterclaim, Cambiano sought injunctive relief against the interim suspension imposed by the Supreme Court Committee on Professional Conduct pursuant to Section 7J of the Procedures of the Arkansas Supreme Court Regulating Professional Conduct of Attorneys at law. Cambiano contended that Section 7J violates both state and federal constitutions. In conjunction with the dismissal, the trial court also certified its order to be final for appeal purposes pursuant to Ark. R. Civ. P. 54(b). We have jurisdiction pursuant to Ark. Sup. Ct. R. 1-2(a)(5) as an appeal involving the discipline of attorneys-at-law and/or arising under the power of the supreme court to regulate the practice of law. The issue before this court is whether Section 7J is constitutional. We hold that it is and accordingly affirm.

*Facts*

Cambiano received his law license in 1980 and apparently has practiced law in this state since that time. In April of 1997, the federal government indicted Cambiano alleging thirty-one counts of various federal offenses including money laundering and filing a false currency transaction report. Cambiano pled guilty to filing a false currency transaction report and the U.S. Attorney agreed to drop the remaining thirty counts. United States District Court Judge George Howard sentenced Cambiano to three years probation on June 26, 1998. Approximately a month later, the Committee on Professional Conduct ("the Committee") imposed an interim suspension on Cambiano's law license. The Committee suspended Cambiano's law license pursuant to Section 7(E)(3)(a) and (b) and 8B(1)(a) and (b) of the Procedures of the Arkansas Supreme Court Regulating the Professional Conduct of Attorneys at Law ("the Procedures").

In February 1999, the Committee instituted disbarment proceedings in Conway County Circuit Court citing his conviction as well as the illegal conduct alleged in the federal indictment. Cambiano answered the disbarment complaint on February 18, 1999, and counterclaimed on April 22, 1999. Specifically, Cambiano's counterclaim requested injunctive relief and a declaratory judgment that

the interim suspension during the pendency of the disbarment proceedings under Section 7J of the Procedures was unconstitutional and that it violates his civil rights. Cambiano's counterclaim sought to have the Rule declared unconstitutional so that he could continue to work for his father, who is also an attorney, while waiting for the disbarment trial. Cambiano argued that the rule violated his rights to free speech and association, due process of law, and was void for vagueness under the Fourteenth Amendment to the Constitution. The Committee responded on May 10, 1999, with a Motion to Dismiss the Counterclaim under Ark. R. Civ. P. 12(b)(6).

The circuit court held a hearing on November 10, 1999 on the motion. There, Cambiano and his father testified about the type of work he would perform at his father's office should the suspension be lifted. The attorneys for the parties engaged in oral argument about the impact and breadth of the suspension rule, and the trial court ultimately granted the Committee's Motion to Dismiss the Counterclaim. In granting the dismissal, however, the trial court also determined that the order was final and appealable so that Cambiano could pursue this appeal while the underlying disbarment case proceeded. The actual order was filed on January 3, 2000, and Cambiano filed his Notice of Appeal on January 24, 2000.

### Standard of Review

■ On review of a decision of the circuit court in disbarment cases, we review the matter de novo on the record and will not reverse the trial court's findings unless they are clearly erroneous. *Neal v. Matthews*, 342 Ark. 566, 30 S.W.3d 92 (2000). A finding is clearly erroneous when although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Neal v. Hollingsworth*, 338 Ark. 251, 992 S.W.2d 771 (1999). With respect to interpretation of statutes, however, this court is not bound by the decision of the trial court as it is for this court to decide what a statute means. *Central & Southern Companies, Inc. v. Weiss*, 339 Ark. 76, 3. S.W.3d 294 (1999).

*Applicable Rules*

This appeal involves the Procedures and their application to a suspended attorney. Under Section 2C(1), the Committee has the authority "to investigate all complaints alleging violation of the Model Rules that may be brought to its attention and impose any sanctions deemed appropriate as provided in Section 5 (Procedure) and Section 7 (Sanctions)." Section 7 states in relevant part:

Section 7. *Sanctions.*

A. *Grounds for Discipline.* It shall be grounds for discipline for a lawyer to:

(1) Violate or attempt to violate the Model Rules of Professional Conduct, or any other rules of this jurisdiction regarding professional conduct of lawyers;

\*\*\*

B. *Serious Misconduct.* Serious misconduct is conduct in violation of the Model Rules that would warrant a sanction terminating or restricting the lawyer's license to practice law. Conduct will be considered serious misconduct if any of the following considerations apply:

(1) The misconduct involves the misappropriation of funds;
(2) The misconduct results in or is likely to result in substantial prejudice to a client or other person;
(3) The misconduct involves dishonesty, deceit, fraud, or misrepresentation by the lawyer;

\*\*\*

(6) The misconduct constitutes a "Serious Crime" as defined in these Procedures.

\*\*\*

D. *Types of Sanctions.* Misconduct shall be grounds for one or more of the following sanctions:

\*\*\*

(3) INTERIM SUSPENSION: A temporary suspension for an indeterminate period of time of the lawyer's privilege to engage

in the practice of law pending the final adjudication of a disciplinary matter.

E. *Imposition of Sanctions*. When the Committee finds that an attorney has violated any provision of the Model Rules, the Committee is authorized:

***

(3) To temporarily suspend the lawyer's privilege to practice law pending final adjudication and disposition of a disciplinary matter. Interim suspension shall be appropriate in the following situations:

(a) Immediately on decision to initiate disbarment;
(b) Immediately upon conviction of a felony notwithstanding pending post-conviction actions;

Central to the issues in this case is Section 7J detailing the restrictions on employment of disciplined attorneys. This section states:

(1) When attorneys have been placed on inactive status, suspended, disbarred, or have surrendered their licenses, they are ineligible to practice law within this jurisdiction until readmitted or reinstated.

(2) While on suspension or inactive status, an attorney shall not be employed in any capacity whatsoever with a lawyer, law firm or lawyer professional association. Employment is construed as the provision of any services or labor for the benefit of the law practice of the employing lawyer or lawyers, whether compensated or not, and irrespective of the location where the services or labor may be performed.

(3) An attorney who has been disbarred or has surrendered his or her law license may be employed by a lawyer, law firm or lawyer professional association to perform such services only as may be ethically performed by other lay persons employed in the law offices. Provided, however, that the following conditions apply:

***

(c) The employed former lawyer shall have no direct contact with any client or receive, disburse, or otherwise handle trust funds or property.

As indicated in Section 2(c), the Arkansas Supreme Court has granted authority to regulate the legal profession in Arkansas to the Committee, and the Court has put into effect specific rules for the discipline and monitoring of disciplined attorneys in the state. Some of these regulations, as noted, limit or terminate a person's privilege to practice law. Cambiano's challenge to the rules questions whether some of these rules are violative of the Constitution and whether they should be stricken.

## Freedom of Speech and Association

In this appeal, Cambiano argues that an interim suspension under Section 7J violates his constitutional rights. Cambiano makes a three-part argument. First, he contends that his rights to free speech and association under the First Amendment are chilled under the rule because he is not allowed to work for or discuss legal matters with other attorneys even though he has no contact with clients. Cambiano argues that while the Arkansas Supreme Court has "some rights" to regulate the conduct of suspended attorneys, this right is not unfettered, particularly in the area of speech. Cambiano argues that the rule does not only regulate his "commercial" speech, but also his political speech as he may want to express his political opinion in a legal framework.

In response, Neal first responds that the United States Supreme Court has determined that states have broad latitude to regulate professions in their boundaries, and that states could limit an attorney's First and Fourteenth Amendment rights in order to protect the public. The Procedures include the specific language that an attorney who is convicted of a felony will be suspended pending disbarment, and Section 7J was created to protect the public. Neal argues that the speech involved at issue is "commercial" speech in that it is speech that is made for a business purpose, and that the overbreadth doctrine does not apply to this type of speech. Section 7J does not prevent an attorney from making "political" speech; instead, it prevents an attorney from aiding a client, with or without compensation, which is "commercial" speech. Neal is correct on this point.

■■ Generally, States have a strong interest and a right to regulate professions within their boundaries, and the States bear "a

special responsibility for maintaining standards among members of the licensed professions." *Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 460 (1978). In particular, the States's interests in regulating lawyers is "especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.' " *Id.* (citing *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975)). However, this right of regulation is not absolute; actions protected by the First Amendment continue to receive at least some level of protection "even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law." *Gentile v. State Bar of Nevada*, 501 U.S. 1030,1054 (1991).

■ In the realm of First Amendment speech, the Supreme Court has identified three types of speech, and has assigned varying levels of protection under the First Amendment for that speech. These three have been categorized as "pure speech," "not-so-pure speech," and "impure speech." Chester James Antieau, *Modern Constitutional Law* § 4.00 et seq. (2nd ed. 1997, Supp. 1999). At issue in this case is whether the speech proscribed by Section 7J is "political" speech, a form of "pure speech," affording the strictest protection under the First Amendment, or "commercial speech," a form of "not-so-pure speech," which only garners intermediate protection under the First Amendment. Cambiano argues that Section 7J could impair his right to "political speech" which is afforded the highest level of protection. Neal argues that Section 7J only proscribes "commercial speech," affording it lesser protection which is overcome here by the Committee's substantial interests in regulating the profession.

■ To determine the type of speech proscribed here, we must review both the language and effect of Section 7J of the Procedures. As noted, an attorney who is suspended is barred from being employed by any lawyer or law firm in any capacity, for compensation or not, during the suspension. In Section 7J(2), "employment" is "construed as the provision of any services or labor for the benefit of the law practice of the employing lawyer or lawyers, whether compensated or not, and irrespective of the location where the services or labor may be performed." Section 7J(2). In other words, a suspended attorney may not provide any services to an attorney, for pay or not, at any location, if such services would benefit the law practice. While this provision seems rather broad at first glance,

a plain reading of the section indicates that the section curtails commercial speech or an "expression related solely to the economic interests of the speaker and its audience." *Virginia Pharmacy Board v. Virginia Citizens Consumer Council*, 425 U.S. 748, 762 (1976); *Bates v. State Bar of Arizona*, 433 U.S. 350, 363-364 (1977); *Friedman v. Rogers*, 440 U.S. 1, 11 (1979). The Supreme Court's decisions have recognized "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 562 (1980).

As the Supreme Court stated in *Ohralik*:

> Expression concerning purely commercial transactions has come within the ambit of the Amendment's protection only recently. In rejecting the notion that such speech "is wholly outside the protection of the First Amendment," *Virginia Pharmacy, supra*, at 761, we were careful not to hold "that it is wholly undifferentiable from other forms" of speech. 425 U.S. at 771 n. 24. We have not discarded the "common-sense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech. *Ibid.* To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech. Rather than subject the First Amendment to such a devitalization, we instead have afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of noncommercial expression.

*Ohralik*, 436 U.S. at 455-456. In *Ohralik*, a case involving in-person solicitations of clients by an attorney in violation of the Ohio Bar's rules against such conduct, the Supreme Court noted that:

> A lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns. It falls within the State's proper sphere of economic and professional regulation. (Citation omitted.) While entitled to some constitutional protection, appellant's conduct is subject to regulation in furtherance of important state interests.

*Id.*, 436 U.S. at 459.

■ Because the speech here is commercial speech, it is afforded only a "limited measure of First Amendment protection." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995). This limited measure of protection for "commercial speech" is in the form of "intermediate" scrutiny which is accomplished by following the four prongs set out in *Central Hudson*. These prongs include:

> In commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson*, 447 U.S. at 566.

■ We hold that Section 7J directly advances the important governmental interests of consumer protection and the integrity of the legal system. Further we hold that it is no more restrictive than necessary and is thus constitutional. In *Lawline v. American Bar Association*, 956 F.2d 1378 (7th Cir. 1992), the United States Court of Appeals for the Eleventh Circuit held that Illinois had the right to regulate the practice of law by forbidding attorneys from entering into partnerships with nonlawyers if any of the activities of the partnership consisted of the practice of law. The Eleventh Circuit Court of Appeals found that the State's interest in preventing incompetent legal assistance was adequate justification for the rule. The plaintiffs in Lawline asserted the same causes of action as those asserted by Cambiano. Regarding the freedom of speech challenge, the court determined that since the state had a legitimate interest to protect, "any abridgment of the right to free speech is merely the incidental effect of observing an otherwise legitimate regulation." *Lawline*, 956 F.2d at 1386. Furthermore, the *Lawline* court rejected the argument that the regulation at issue violated the plaintiffs's rights to freedom of association because no fundamental right was at issue to trigger the protection. Such is the case here, as there is no fundamental right to work as an attorney or at a law firm. The practice of law is a privilege to engage in commercial activity, not a

right. As such, the freedom of association in the First Amendment does not apply.

■ Cambiano also asserts that Section 7J is overly broad in that it "bans Cambiano's core political protected speech." In essence, Cambiano argues that some legal issues on which he could give advice are actually political issues which are protected by a "strict scrutiny" review under the First Amendment. Because we have held the speech at issue to be commercial speech, we also hold the overbreadth doctrine to be inapplicable. *See Ohralik; Shapiro v. Kentucky Bar Ass'n*, 486 U.S. 466 (1988). Furthermore, while the Supreme Court agrees that "political speech" is the core form of speech protected by the First Amendment, *See Ohralik* and *Gentile*, there is a difference between providing legal advice to a lawyer or client, and espousing political views on issues such as the death penalty.

Cambiano attempts to argue that providing legal advice on how to litigate a death-penalty case is "political speech." However, it is more accurately described as speech with a commercial purpose of representing a client. The rule does not restrict Cambiano from using available public forums to state positions opposing the death penalty. However, to provide specific legal advice to an attorney who is handling a death-penalty case would violate his suspension.

## Due Process

Second, Cambiano argues that Section 7J violates the Fourteenth Amendment to the Constitution and Article 2, § 8 of the Arkansas Constitution in that it takes away his right to liberty and property without due process of law and it is void for vagueness. He argues that his liberty interests are the freedom of speech and association, and his property interest is his right to income by assisting other lawyers who practice law. He argues that Section 7J is vague in that does not define the terms "ethically performed" or "direct contact."

■ Regarding the liberty and property arguments, Cambiano offers no authority to support his contentions. We have often stated that we will not consider arguments made without authority. *National Bank of Commerce v. Dow Chem. Co.*, 338 Ark. 752, 1 S.W.3d 443(1999); *Dobie v. Rogers*, 339 Ark. 242, 5 S.W.3d 30

(1999); *Farm Bureau Policy Holders v. Farm Bureau Mut. Ins. Co.*, 335 Ark. 285, 984 S.W.2d 6 (1999).

▮ Cambiano's argument is premised on the idea that once licensed, he was then conferred a "property right" to practice law. However, this court has stated again and again that "the practice of law is a privilege and not a right." *See In re Petition Butcher*, 322 Ark. 24, 907 S.W.2d 715 (1995); *In re Petition for Reinstatement of Lee*, 305 Ark. 196, 806 S.W.2d 382 (1991). As such, any protections to a law license are only subject to the very lowest of review under the Due Process and Equal Protections Clauses of the Constitution. Certainly, here, more than sufficient reasons exist to suspend Cambiano from the practice of law. He was convicted of a felony, and under this Court's Procedures, this constitutes grounds for automatic suspension pending an automatic referral for disbarment. As noted by Neal, the reasons to suspend Cambiano and prevent him from having any contact as an attorney with the public is substantial. Furthermore, the court's right to control the practice of law is, in and of itself, substantial reason to effectuate the suspension in this case.

▮▮ Cambiano also argues that certain terms in Section 7J are void for vagueness under the Due Process Clause and should be invalidated. Specifically, he argues that the terms "ethically performed" and "direct contact" in the following provisions are unconstitutionally vague:

> (3) An attorney who has been disbarred or has surrendered his or her law license may be employed by a lawyer, law firm or lawyer professional association to perform such services only as may be *ethically performed* by other lay persons employed in the law offices. Provided, however, that the following conditions apply:
>
> ***
>
> (c) The employed former lawyer shall have no *direct contact* with any client or receive, disburse, or otherwise handle trust funds or property. (Emphasis added.)

Section 7J(3) and (3)(c). As indicated in these two provisions, these definitions apply to a disbarred attorney, not a suspended attorney. Therefore, we consider this challenge a "pre-enforcement facial challenge" which involves a specific standard of review. In *Craft v. City of Fort Smith*, 335 Ark. 417, 984 S.W.2d 22 (1998), the court discussed the vagueness doctrine and stated:

It is well settled that a law is unconstitutionally vague under due process standards if it does not give a person of ordinary intelligence fair notice of what is prohibited, and it is so vague and standardless that it allows for arbitrary and discriminatory enforcement. *See Grayned v. City of Rockford,* 408 U.S. 104 (1972); *Thompson v. Arkansas Social Serv.,* 282 Ark. 369, 669 S.W.2d 878 (1984); *Davis v. Smith,* 266 Ark. 112, 583 S.W.2d 37 (1979). When a person brings a "pre-enforcement facial challenge" to the vagueness of a law, the relevant inquiry is whether the ordinance is "impermissibly vague in all of its applications." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489 (1982) (emphasis added). Likewise, in *Planned Parenthood of Minnesota v. State of Minnesota,* 910 F.2d 479 (8th Cir. 1990), the Eighth Circuit required those who brought a pre-enforcement facial challenge to a fetal disposal law to demonstrate that the "law is impermissibly vague in all of its applications" and that "the statute could never be applied in a valid manner." The subject matter of the challenged law also determines how stringently the vagueness test will be applied. For instance, if the challenged law infringes upon a fundamental right, such as liberty or free speech, a more stringent vagueness test is applied. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc. supra; Thompson v. Arkansas Social Serv., supra; Davis v. Smith, supra.* In contrast, if the law merely regulates business activity, a less stringent analysis is applied and more flexibility is allowed. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., supra; Thompson v. Arkansas Social Serv., supra; Davis v. Smith, supra.*

*Craft,* 335 Ark. at 424. As a "pre-enforcement facial challenge," for Cambiano to prevail the terms at issue in this case must be "impermissibly vague in all of its applications" and "could never be applied in a valid manner" in order to be deemed void for vagueness. We hold within the context of the Procedures that these terms are not impermissibly vague. The terms "ethically performed" and "direct contact" have solid basis in the Rule 5.3 "Responsibilities Regarding Nonlawyer Assistants" in the Model Rules of Professional Conduct and in applicable case law. A person of ordinary intelligence could find a workable framework for these terms under which his or her conduct could be adapted.

### Equal Protection

Finally, Cambiano argues that Section 7J violates his right to equal protection under the Fourteenth Amendment and Article 2, §§ 3 and 18 of the Arkansas Constitution because the rule

places prohibitions on suspended lawyers that are not placed on people who have no law license. He argues that because the rule impinges on fundamental rights, strict scrutiny instead of the rational basis test must be applied to the analysis of the rule. Finally, Cambiano argues that Section 7J violates his right to equal protection. However, as with his due process liberty and property arguments, he cites no authority supporting his contentions. Therefore, it will not be considered. *See Nat'l Bank of Commerce, Farm Bureau*, and *Dobie, supra.*

Affirmed.