Stark LIGON, as Executive Director of the Supreme Court Committee on Professional Conduct *v.* Robert NEWMAN, Arkansas Bar No. 95050

03-1381                                                    231 S.W.3d 662

Supreme Court of Arkansas
Opinion delivered March 9, 2006

[Rehearing denied April 6, 2006.]

*Stark Ligon*, for petitioner.

*Jeff Rosenzweig,* for respondent.

DONALD L. CORBIN, Justice. This is an original action under the Arkansas Supreme Court Procedures Regulating Professional Conduct ("Procedures") in which Petitioner Stark Ligon, as Executive Director of the Arkansas Supreme Court Committee on Professional Conduct ("Committee"), seeks the disbarment of Respondent Robert P. Newman, an attorney licensed to practice law in the State of Arkansas.

The Director filed the instant petition for disbarment with this court on December 9, 2003.[1] According to the petition, on November 21, 2003, Panel A of the Committee voted to initiate disbarment proceedings against Mr. Newman, pursuant to Section 10.D(4) of the Procedures, based on the claims in two committee cases.[2] The first was Committee Case No. 2003-035 and involved a complaint filed by Eleonora Barkasy, the mother of Andre Barkasy, a client of Mr. Newman's. After reviewing the complaint, the Committee found that Mr. Newman had violated nine of the Arkansas Model Rules of Professional Conduct: Rules 1.2(a), 1.3, 1.4(a), 1.4(b), 1.15(a), 1.15(b), 1.16(d), 8.4(b), and 8.4(c) in the course of his representation of Andre.

The second was Committee Case No. 2003-094, which resulted from a complaint filed by the office manager of the law firm of Matthews, Campbell, Rhoads, McClure, Thompson, and Fryauf, where Appellant was once employed. The law firm's complaint centered on Mr. Newman's representation of a client, Matt Miller. The Committee found that Mr. Newman violated Model Rules: 1.15(a), 8.4(b), and 8.4(c) in the course of representing Mr. Miller.

The petition also listed as aggravating factors evidence of other misconduct by Mr. Newman that was under investigation by the Committee but that had not been formally acted on. The first of these aggravators was Committee Case No. 2003-095 based on a complaint by George Rhoads, a member of the Matthews firm.

---

[1] An amended petition for disbarment was filed on June 15, 2004. The only change to the petition was the addition of an aggravating factor based on Committee Case No. 2004-102 that stemmed from a complaint filed by Jorge Duran, a former client of Newman's, related to Newman's representation of Duran in a felony criminal matter in 2003.

[2] Panel A of the Committee also voted to place Newman's law license on immediate interim suspension, pursuant to Section 16.A(1) of the Procedures. The interim suspension became effective on December 2, 2003.

This complaint stemmed from Mr. Newman's representation of Kurt Douglas Enix in a criminal matter in 2001. The second aggravator, based on Committee Case No. 2003-170, stemmed from a complaint filed by Mr. Rhoads alleging violations of the Model Rules by Mr. Newman in the course of his representation of a firm client, Jerry Wever. The final aggravator listed, Committee Case No. 2003-174, was based on a complaint by Edwin McClure, another member of the Matthews firm, alleging misconduct by Mr. Newman while representing Joe Caracciolo in a criminal matter in late 2001 and early 2002.

According to the Director's petition, Mr. Newman's actions constituted "serious misconduct" as defined in Section 17.B(1)–(5) of the Procedures and warrants termination by disbarment of Mr. Newman's license to practice law in this state.

In response to the petition for disbarment, this court appointed the Honorable Jack Lessenberry to preside over the disbarment proceedings of Mr. Newman. *See Ligon v. Newman*, 355 Ark. 620, 143 S.W.3d 576 (2004) (*per curiam*). The disbarment proceeding began with a trial in Fayetteville held on July 26–30, 2004, and concluded in Little Rock on August 3, 2004. At the conclusion of the proceedings in Fayetteville, Mr. Newman moved for a directed verdict on the counts against him.[3] With regard to the Barkasy matter, he alleged that the Director failed to establish a *prima facie* case with regard to the alleged violations of the Model Rules. Specifically, Mr. Newman argued that there was no evidence that he committed a criminal act thereby violating Rule 8.4(b) or 8.4(c). He continued this specific argument with regard to each of the Committee cases. Also, with regard to the Miller case, Mr. Newman argued that Matt Miller's testimony was "inherently incredible" and, thus, was not supporting evidence of any rule violation. With regard to the Wever matter, Mr. Newman admitted that the $500 payment from Wever was never deposited into a trust account and, therefore, if Rule 1.15 is construed as a strict-liability crime, then there was a violation of that rule. However, Mr. Newman argued that the Director never asserted

---

[3] At this time, the Director had not completely rested his case because the testimony of Will Allison, as it related to the Caracciolo matter, was scheduled for August 3 in Little Rock. Newman sought to move for a directed verdict, however, before presenting any of his evidence so as to avoid any question regarding the timing and preservation of his directed-verdict motion. Thus, he did not move for a directed-verdict motion on the Caracciolo matter at this time.

what type of crime allegedly occurred to support a violation of Rule 8.4(b) and (c), arguing that Arkansas does not recognize a crime of conversion. Mr. Newman again admitted with respect to the Enix case that there may have been a violation of Rule 1.15 if it is treated as a strict-liability offense because the Enix money was never deposited into a trust account. Finally, as to the Duran matter, Mr. Newman argued that the fact that another attorney secured a better deal for Mr. Duran than Mr. Newman was able to obtain for him was not sufficient evidence of a violation of the rule of competent representation. He also argued that there was no evidence that he acted dishonestly or fraudulently with regard to the fee agreement between him and Duran.

The special judge denied Mr. Newman's motions for directed verdict on each violation, with the exception of the violation of Rule 8.4(c) in the Duran matter. In so ruling, the special judge found that Mr. Duran was evasive in his testimony and that it was not unreasonable for Mr. Newman to quote a higher fee after realizing that the matter would not result in a plea, but rather would go to trial.

Following the presentation of evidence in Little Rock on August 3, Mr. Newman renewed his motions for directed verdict, requesting permission to file a written motion to dismiss. The trial court agreed and allowed Mr. Newman to file a written motion to dismiss and also allowed the Director to file a written response to the motion. Additionally, the trial court granted Mr. Newman's motion on the remaining count in the Duran matter, finding that there was no evidence that Mr. Newman failed to provide competent representation to Mr. Duran. Thereafter, Mr. Newman filed his written motion, renewing his previously raised arguments. The Director filed his response and additionally argued that the special judge erred in granting Mr. Newman's motion as to the Duran violations.

After considering Mr. Newman's motion to dismiss and the Director's response thereto, the special judge entered a written order on March 18, 2005. Therein, the special judge recommended disbarment as the appropriate sanction, finding that Mr. Newman's actions of violating numerous Model Rules constituted serious misconduct. The special judge's findings of fact and conclusions of law, as well as his recommended sanction are now before this court.

The Procedures were revised by this court by *per curiam* order on July 9, 2001, with an effective date of January 1, 2002; hence,

the revised procedures are applicable to the case at bar. Section 1(c) of the Procedures provides that disciplinary proceedings are neither civil nor criminal in nature but are *sui generis*, meaning of their own kind. *See also Neal v. Hollingsworth*, 338 Ark. 251, 992 S.W.2d 771 (1999). The only case falling within the ambit of the revised procedures that has heretofore been before this court is *Ligon v. Price*, 360 Ark. 98, 200 S.W.3d 417 (2004). There, we discussed the appropriate standard of review, stating that the special judge's findings of fact are accepted by this court unless they are clearly erroneous. *Id.* This court imposes the appropriate sanction as warranted by the evidence. *Id.* There is no appeal from this court except as may be available under federal law. *Id.*

A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*; *Hollingsworth*, 338 Ark. 251, 992 S.W.2d 771. The court must view the evidence in a light most favorable to the decision of the special judge, resolving all inferences in favor of his findings of fact.[4] Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. *Id.* The purpose of disciplinary actions is to protect the public and the administration of justice from lawyers who have not discharged their professional duties to clients, the public, the legal system, and the legal profession. *Id.* Remaining mindful of this standard, we now consider Mr. Newman's assertion that the special judge erred when he recommended disbarment.

In light of our standard of review, we must say that we find no merit to Mr. Newman's assertion that the appropriate standard of proof should be one of clear and convincing evidence. Section 7 of the Procedures provides that formal charges of misconduct must be proved by a preponderance standard. Moreover, the preponderance standard has been utilized most recently in *Price* and as far back as *Hurst v. Bar Rules Comm. of the State of Ark.*, 202 Ark. 1101, 155 S.W.2d 697 (1941). Finally, we disagree with Mr.

---

[4] We erroneously stated in *Price*, 360 Ark. 98, 200 S.W.3d 417, that we view the evidence in the light most favorable to the respondent. We now take the opportunity to clarify our standard of review. As previously stated, this court will accept the special judge's findings unless they are clearly erroneous. Here, as in *Price*, the special judge found that the respondent committed serious misconduct warranting disbarment; thus, in order to view the evidence in the light most favorable to Mr. Newman, we would be forced to disregard the findings of the special judge. This we will not do.

Newman's assertion that the revocation of his right to practice law involves a significantly protected right. We have repeatedly held that the practice of law is a privilege extended by the State and not a right. *Cambiano v. Arkansas Bd. of Law Examiners*, 357 Ark. 336, 167 S.W.3d 649 (2004); *Cambiano v. Neal*, 342 Ark. 691, 35 S.W.3d 792 (2000), *cert. denied*, 532 U.S. 1009 (2001); *In re Petition of Butcher*, 322 Ark. 24, 907 S.W.2d 715 (1995); *In re Petition for Reinstatement of Lee*, 305 Ark. 196, 806 S.W.2d 382 (1991) (*per curiam*); *McKenzie v. Burris*, 255 Ark. 330, 500 S.W.2d 357 (1973).

For purposes of clarity, we will address each complaint separately and set out the special judge's findings as to each count. Before doing so, however, it is helpful to explain the events that are the genesis for the instant disbarment action. Mr. Newman had been employed with the Matthews firm for approximately five years. In the beginning of 2002, just as Mr. Newman was being considered for partnership status, Deborah Campbell, the firm's office manager, discovered a billing irregularity with regard to one of Mr. Newman's clients. Specifically, Mrs. Campbell received a phone call from Jerry Wever, one of Mr. Newman's clients, expressing concern that he received a bill from the firm that did not reflect a $500 payment that he had made. Mr. Wever sent Mrs. Campbell a copy of his canceled check that revealed that it had been endorsed and cashed by Mr. Newman. At a meeting with the firm's partners, Mr. Newman was asked about the canceled check, and he attempted to explain what happened. According to Mr. Newman, the matter that Mr. Wever hired him to handle was time sensitive and because he thought he might need some money to cover costs, Mr. Newman cashed the check. He then stated that he forgot about the money until he ran into Mr. Wever at Office Depot. After giving this explanation, Mr. Newman reached into his pocket and pulled out five $100 bills that he then gave to one of the partners.

At a meeting the next morning, the partners asked Mr. Newman if he had ever deposited client money into his account on any other occasion. He initially answered that he did not think so, but when pressed by the partners, he stated unequivocally that he had not. The partners decided to accept Mr. Newman's explanation, but Mrs. Campbell requested permission to investigate to determine if there were any other billing irregularities on the part of Mr. Newman. In the course of her investigation, Mrs. Campbell contacted some of Mr. Newman's clients and discovered other questionable billing practices. It was discovered that Mr. Newman

accepted a check for $2,500 from Jim Enix as payment to represent his son, Kurt Douglas Enix, in a criminal matter. Mr. Newman deposited the Enix check into his personal account on June 21, 2001. Then, on January 18, 2002, Mr. Newman contacted Kurt and asked him to sign five money orders that he had purchased. Mr. Newman then turned the money orders over to his law firm. At that time, however, the firm had already received a copy of Jim Enix's canceled check. Mr. Newman's employment was subsequently terminated.

After terminating Mr. Newman, the firm discovered some unusual activity with regard to Mr. Newman's handling of restitution on behalf of his client, Joe Caracciolo. Mr. Newman worked out a deal with the Washington County Prosecuting Attorney to drop criminal charges pending against Mr. Caracciolo for theft from Fletcher Honda, in exchange for him paying $1,500 in restitution. Mr. Caracciolo's mother had paid $1,800 to the Matthews firm to cover the cost of restitution and attorney's fees. A check drawn on the Matthews firm in the amount of $1,500 was sent to the prosecuting attorney. She returned the check to Mr. Newman, with instructions that he send the payment to Will Allison, the attorney for Fletcher Honda. At that time, Mr. Newman's secretary prepared a $1,000 check made payable to Fletcher Honda and a $500 check made payable to Mr. Caracciolo. Mr. Newman then signed Mr. Caracciolo's name to the check and cashed it. When contacted by Mr. Allison about the missing $500 in restitution, Mr. Newman sent him one of his personal checks for $500. Mr. Allison refused this check and eventually contacted Ed McClure, a partner in the Matthews law firm. Mr. McClure sent Mr. Allison a new check from the firm's trust account for $1,500. The firm's trust account was then overdrawn by $500 and the firm demanded payment of that amount from Mr. Newman, who subsequently repaid the firm.

The Matthews firm subsequently contacted the Office of Professional Conduct to file a complaint against Mr. Newman. The Director's subsequent investigation of these matters, as well as incidents involving Mr. Newman's representation of Andre Barkasy, Matt Miller, and Jorge Duran, formed the basis for his petition for disbarment. With this background information in mind, we now turn to the trial court's findings of fact and conclusions of law.

## I. Barkasy

During the course of investigating the complaint against Mr. Newman, the Director contacted Eleonora Barkasy, mother of Andre Barkasy, who had been represented by Mr. Newman in several criminal matters. Initially, Ms. Barkasy paid Mr. Newman $7,500 to represent her son on some drug-related matters in Benton County. She subsequently sent him another $7,500 fee to represent Andre in a criminal matter in Missouri. Ms. Barkasy explained that she also sent a check for $2,600 to Mr. Newman at his home. She stated that she believed this check was to cover final court fees so that Andre could leave Arkansas and return to California.

In November of 2001, Andre entered a guilty plea in Washington County Court. He was sentenced to forty-eight months' probation. One of the written conditions of his probation was that he pay $150 in court costs and restitution of $1,000. After the State sought to revoke Andre's probation, his mother traveled to Arkansas, and Mr. Newman took her and Andre to the Washington County Clerk's office to pay the $1,150 owed. Mr. Newman subsequently paid costs of $125 in Andre's City of Fayetteville case. He also paid $350 in a pending Springdale case, but later asked Ms. Barkasy to reimburse him for that payment. At the time that Ms. Barkasy paid the Washington County fees, she did not question Mr. Newman about the prior $2,600 payment.

Mr. Newman claimed that the $2,600 check was to repay him for personal expenditures that he had made on behalf of Andre, as well as to cover cash loans that he had made to him. Andre admitted that Mr. Newman provided him with a small amount of food and medicine at a time when he was sick, but he denied that Mr. Newman ever gave him any cash.

A review of the special judge's findings reveals that he determined that Mr. Newman violated Model Rules: 1.3, 1.4(b), 1.15(a), 8.4(b) and 8.4(c). However, the special judge determined that Mr. Newman did not violate: Rules 1.2(a) by not abiding by his client's wishes; Rule 1.4(a) by failing to keep Barkasy informed; Rule 1.15(b) by failing to provide Ms. Barkasy with an accounting of the $2,600; Rule 1.16(d) by failing to protect his client's interest, surrender any property, and refund any advance payment of fee that had not been earned.

In reaching this conclusion, the special judge noted that he did not believe that the Director proved by a preponderance of the evidence that the $2,600 payment was intended to cover the $1,150 in fees owed in Washington County. The special judge further found, however, that Mr. Newman grossly overstated Andre's debts for food, medicine, and telephone charges. He also found that Mr. Newman did not loan Andre any money.

Mr. Newman now argues that the special judge's findings of fact "split the baby" in a way that renders them clearly against the preponderance of the evidence. Specifically, he argues that the special judge found in his favor by holding that there was a failure of proof that the $2,600 was intended to cover the $1,150 owed to the Washington County court. This finding was subsequently contradicted by the special judge's finding that Mr. Newman was obligated to pay $125 to Fayetteville and $350 to Springdale on Andre's behalf. He further argues that the special judge's finding faulting Mr. Newman for not having an accounting of the personal expenses he incurred on Andre's behalf was in error because there is no requirement that he keep such an accounting. Finally, Mr. Newman acknowledges that the special judge's findings are given due deference by this court but submits that this situation is ambiguous and thus does not warrant the classification of serious misconduct.

The Director's only argument with regard to the trial court's findings is concerned with the finding that there was no violation of Rule 1.2(a). According to the Director, the evidence clearly supported Ms. Barkasy's statement that the $2,600 was intended to cover Andre's court costs and fees.

We disagree with both Mr. Newman and the Director. We begin our analysis by reviewing the Model Rules that the special judge found had been violated by Mr. Newman. The first is Rule 1.3 which provides that a lawyer shall act with reasonable diligence and promptness in representing a client. The special judge found that Mr. Newman violated this rule by not timely paying the money Andre owed to the City of Springdale.

Next, the special judge found that Mr. Newman violated Rule 1.4(b) by failing to describe the specific expenses comprising the $2,600. Rule 1.4(b) provides that:

> A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

The special judge found that Mr. Newman violated Rule 1.15(a) in failing to properly separate his client's money from his property. Specifically, the trial judge found that Mr. Newman violated this rule by depositing the $2,600 check into his personal account held jointly with his wife. Rule 1.15(a)(1) provides that:

> A lawyer shall hold property of clients or third persons, including prospective clients, that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

The special judge found a violation of Rule 8.4(b) on the basis that Mr. Newman committed theft in connection with his taking of the $2,600, specifically, that Mr. Newman was vague about the fees and expenses that had been incurred in reaching the $2,600 amount. Rule 8.4(b) provides that it is professional misconduct for a lawyer to:

> commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]

Finally, the special judge concluded that Mr. Newman violated Rule 8.4(c) for engaging in dishonest conduct for not using the money to pay Springdale and for committing theft. Rule 8.4(c) provides that it is professional misconduct for an attorney to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

Clearly, the trial court's conclusions regarding these violations were based on his review of the testimony in this case. The special judge had the benefit of hearing the witnesses' testimony and is better suited in assessing the credibility of those witnesses. It is axiomatic that disputed facts and determination of credibility of witnesses are within the province of the factfinder. *Neal v. Matthews*, 342 Ark. 566, 30 S.W.3d 92 (2000); *Hollingsworth*, 338 Ark. 251, 992 S.W.2d 771. Accordingly, we cannot say that any of the special judge's findings of violations of the Model Rules related to the Barkasy matter are clearly erroneous.

We further note that Mr. Newman's argument that there can be no violation of Rule 8.4(b) because he was never charged with or convicted of a crime is without merit. Mr. Newman's interpretation of this rule is far too narrow. Nothing in the rule requires that there be a formal charge or conviction before

the rules can be applied to an attorney's conduct. In fact, in *Hollingsworth*, this court found that the attorney violated Rule 8.4(b) despite the fact that the client from whom he stole money never pressed criminal charges against him.

Likewise, we cannot say that the special judge was clearly erroneous in finding that Mr. Newman did not violate Rule 1.2(a). That rule provides:

> (a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation, and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

The Director avers that the greater weight of evidence supported Ms. Barkasy's statement that the $2,600 was intended as payment for her son's court costs. Again, this is a matter of credibility, and we cannot say the special judge clearly erred in this regard.

## II. Miller Complaint

At issue here is an allegation that Mr. Newman converted to his own personal use cash funds paid by Mr. Miller as attorney's fees in criminal matters in which Mr. Newman was representing him. According to the complaint, Mr. Newman converted $650 in fees intended for his law firm, thereby violating Model Rules 1.15(a), 8.4(b), and 8.4(c).

According to Mr. Miller, he made an initial cash payment of $150 while meeting with Mr. Newman at his office. The Matthews firm had a record of this payment, $125 of the money was credited to Mr. Miller's case in the City of Lowell, while the remaining $25 was credited to his case in the City of Rogers. Mr. Miller also claimed that he made a second cash payment of $175 that he assumed would be used to resolve a warrant that had been issued for his arrest after he failed to appear in court. The Matthews firm had no record of this payment. The third payment Mr. Miller stated that he made was in the amount of $475, and he stated that

he gave Mr. Newman this money after he met him at an A & W gas station a couple of days prior to his scheduled court date in Rogers.

Mr. Newman stated that he only received money from Mr. Miller on one occasion, when he met him at the A & W gas station. According to Mr. Newman, however, Mr. Miller only paid him $150, which he then handed over to the firm as reflected by the firm's account.

After reviewing the evidence, the special judge determined that Mr. Newman violated Rules 1.15(a), 8.4(b), and 8.4(c). The special judge found that the weight of evidence proved that the $150 paid by Mr. Miller was paid immediately after his first meeting with Mr. Newman. The trial court discredited Mr. Miller's testimony regarding the second payment of $175, but concluded that his testimony that he paid $475 at the A & W meeting was more credible than Mr. Newman's explanations that he only paid $150 at that meeting.

Mr. Newman argues that the trial court erred in finding that he violated these rules because Mr. Miller's testimony was contradictory and implausible. Again, the special judge's findings in this regard are based on his assessment of the evidence and the credibility of witnesses; hence, we cannot say that he clearly erred in this regard. Mr. Newman also reiterates his previous argument that there can be no violation of Rule 8.4(b) because he committed no crime here. Having addressed the criminal-charge issue in the Barkasy matter, we need not reiterate our position.

### III. Enix Complaint

The first aggravating factor set out in the petition for disbarment and considered by the trial court involved Mr. Newman's representation of Mr. Enix. As previously stated, Mr. Newman accepted a check for $2,500 from Jim Enix as payment to represent his son, Kurt. Mr. Newman deposited this check into his personal account, but almost seven months later contacted Kurt and asked him to sign five money orders that he subsequently turned over to his law firm. According to the Committee's complaint, Mr. Newman's action in this matter resulted in violations of Model Rules 1.15(a), 8.4(b), and 8.4(c).

Mr. Newman stated that the fee in the Enix matter was originally supposed to be $5,000. He further stated that he initially received a $2,500 check from Robin Enix, Kurt's wife, and then a

second check for $2,500 from Jim, but the check from Robin was written on insufficient funds. According to Mr. Newman, he did not report the $2,500 that he received in the hope that the firm would continue to bill the Enixes and eventually collect the remaining $2,500 owed.

■ The special judge found that Mr. Newman violated Rules 1.15(a), 8.4(b), and 8.4(c). In so concluding, the special judge discredited Mr. Newman's explanation on this matter and found that he received this legal fee and deposited it into his personal account. According to the special judge, Mr. Newman then concocted an "elaborate means" to get the money to the Matthews law firm. The special judge also found that Mr. Newman falsified a law firm document showing the Enix fee to be a flat fee of $2,500.

The only challenge raised by Mr. Newman as to this matter is the trial court's finding that he violated Rule 8.4(b) because there was no evidence that he committed a criminal act. Having resolved this issue in the Barkasy matter, we need not review it again.

### IV. Wever Complaint

The second aggravator considered by the special judge involved Mr. Newman's representation of Mr. Wever. As previously stated, Mr. Wever gave Mr. Newman a $500 check that Mr. Newman then cashed without reporting it to his firm. In its complaint, the Committee alleged that Mr. Newman's actions in this regard violated Rules 1.15(a), 8.4(b), and 8.4(c).

In reviewing the evidence the special judge determined that Mr. Newman violated Model Rules 1.15(a), 8.4(b), and 8.4(c). This conclusion was based on the finding that Mr. Newman cashed the $500 check but did not report any of it to the law firm until after the partners learned of his conduct.

■ Mr. Newman argues that his failure to deposit the $500 into the firm account was inadvertent. This fact is irrelevant, however, because the undisputed evidence demonstrated that Mr. Newman failed to deposit the money into a firm account, thereby violating Rule 1.15(a). Accordingly, the special judge did not err in finding a violation of this rule.

Additionally, we again reject Mr. Newman's assertion that there can be no violation of Rule 8.4(b) where there has been no crime or conviction. Finally, the issue of whether there was a

violation of Rule 8.4(c) because of Mr. Newman's misconduct is one based on the special judge's assessment of the credibility of witnesses and thus we cannot say that he clearly erred.

## V. Caracciolo Complaint

The next aggravator stemmed from Mr. Newman's representation of Mr. Caracciolo and his handling of a restitution agreement worked out with the prosecuting attorney and Fletcher Honda. The Committee's complaint alleged that Mr. Newman's questionable handling of the Caracciolo matter violated Model Rules 1.3, 1.4(a), 1.4(b), 8.4(a), 8.4(b), and 8.4(c) because he failed to act diligently on his client's behalf and failed to keep his client reasonably informed. The complaint also alleged that he intentionally attempted to defraud Fletcher Honda by paying less than the agreed-upon amount of restitution.

Mr. Newman stated that he was unsure how the $1,500 restitution check was converted into two separate checks. According to him, in reviewing the Caracciolo file, he discovered that there was an overpayment made by Mr. Caracciolo, and he directed his secretary to prepare one check to Fletcher Honda and another to the client, without specifying an amount for each check.

The special judge found no Model Rule violations with regard to this matter. In so doing, he relied on his finding that no one gained anything in this matter, and that Mr. Newman's actions were irresponsible and irrational. The special judge further stated, however, that he chose to accept the testimony of Ms. Judith Sears, Mr. Newman's secretary, that he directed her to make the two checks payable as she did. According to the special judge, if Mr. Newman intended to commit a criminal act, he did not do a very good job of hiding it.

The Director now argues that the special judge's findings and conclusions in the Caracciolo matter were clearly erroneous with regard to Rule 8.4(a), 8.4(c), and 8.4(d). Specifically, the Director argues that the special judge's findings on the check endorsement are contradictory in that he found that Mr. Newman did not obtain Mr. Caracciolo's permission to endorse the check until several days after he had already endorsed it. According to the Director, this finding supports an inference that Mr. Newman intended to pocket the $500.

While the evidence in this matter clearly indicates that Mr. Newman engaged in questionable behavior, the ultimate

question of whether there was a violation of any of the Model Rules turned wholly on the credibility of the witnesses, a matter within the province of the fact-finder. Accordingly, we cannot say that the special judge erred in finding no violations.

## VI. Mitigation and Aggravation

Having determined that the special judge's findings of fact and conclusions of law were not clearly erroneous, we now turn to the issue of mitigators and aggravators.[5] As explained in *Price*, 360 Ark. 98, 200 S.W.3d 417, when Model Rules have been violated by either serious or lesser misconduct, a penalty phase proceeds where the defendant attorney and the Director are allowed to present evidence and arguments regarding aggravating and mitigating factors to assist in determining the appropriate sanction. *See also Hollingsworth*, 338 Ark. 251, 992 S.W.2d 771. Aggravating factors developed by the American Bar Association Joint Committee on Professional Standards and adopted by this court in *Wilson v. Neal*, 332 Ark. 148, 964 S.W.2d 199 (1998), are:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with [the] rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practice during the disciplinary process;

(g) refusal to acknowledge [the] wrongful nature of [the] conduct;

(h) vulnerability of [the] victim;

---

[5] We note that there was one other committee case submitted as an aggravator that involved Mr. Newman's representation of Jorge Duran. The special judge, however, ultimately determined that Mr. Newman committed no Model Rules violations in connection with this matter, and the Director does not challenge that finding.

(i)  substantial experience in the practice of law;

(j)  indifference to making restitution; and,

(k)  illegal conduct, including that involving the use of controlled substances.

Mitigating factors include:

(a)  absence of a prior disciplinary record;

(b)  absence of a dishonest or selfish motive;

(c)  personal or emotional problems;

(d)  timely good faith effort to make restitution or to rectify [the] consequences of [the] misconduct;

(e)  full and free disclosure to [the] disciplinary board or cooperative attitude towards [the] proceedings;

(f)  inexperience in the practice of law;

(g)  character or reputation;

(h)  physical disability;

(i)  mental disability or chemical dependency including alcoholism or drug abuse when;

(1)  there is medical evidence that the respondent is affected by a chemical dependency or mental disability;

(2)  the chemical dependency or mental disability caused the misconduct;

(3)  the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation;  and,

(4)  the recovery arrested the misconduct and recurrence of that misconduct is unlikely.

(j)  delay in [the] disciplinary proceedings;

(k) impositions of other penalties or sanctions;

(l) remorse;

(m) remoteness of prior offenses.

*Id.* at 163-64, 964 S.W.2d at 207 (quoting *Model Standards For Imposing Lawyer Sanctions* §§ 9.22 and 9.32 (1992)).

Here, the special judge found that Mr. Newman presented a substantial amount of compelling proof regarding his reputation in the community that spoke both to his good character and capable representation of clients. The special judge found it notable that two circuit judges appeared on Mr. Newman's behalf and attested to his legal skills. The special judge also noted that there was ample testimony about Mr. Newman's work in the community as a volunteer in the Rogers District Court's First Offender Teenage Program and as a volunteer attorney in domestic-violence cases. Also, the special judge placed great emphasis on Mr. Newman's recognition as the Benton County Bar Association's Volunteer Attorney of the Year.

With regard to aggravating factors, the special judge found that the violations here primarily centered on the misappropriation of funds, but further noted that other than the Barkasys, the victim was the Matthews law firm. According to the special judge, Mr. Newman's actions established a pattern of misconduct. He also noted that while Mr. Newman forthrightly admitted to some instances of misconduct, he appeared remorseless with regard to other instances of misconduct.

Newman acknowledges the above-stated mitigators and aggravators, but argues that pursuant to our decision in *Price*, 360 Ark. 98, 200 S.W.3d 417, mitigation is not restricted solely to the mitigators listed in *Wilson*, 332 Ark. 148, 964 S.W.2d 199. Specifically, Mr. Newman points to the fact that he made restitution in the Wever and Enix matters and that he has been under interim suspension, which should qualify as "other penalties or sanctions." Moreover, Mr. Newman avers that the special judge's analysis of the Section 19 factors was incomplete and should have included the following facts: his clients suffered no loss or damage, other than the disputed amount in the Barkasy matter; the legal profession was not damaged in the eyes of the public, as this was primarily an internal matter to the Matthews law firm; the profit to Mr. Newman was minimal; Mr. Newman's conduct during the proceedings was wholly proper.

While Mr. Newman takes issue with the thoroughness of the special judge's findings with regard to mitigation and aggravation, we cannot say that he clearly erred in this regard. It appears from his order that he considered all relevant evidence.

## VII. Sanction

Pursuant to Section 17 of the Procedures, violations of the Model Rules fall into two separate categories of misconduct: serious misconduct and lesser misconduct. Serious misconduct is conduct in violation of the Model Rules that warrants a sanction terminating or restricting a lawyer's license to practice law, whereas lesser misconduct does not. *Price*, 360 Ark. 98, 200 S.W.3d 417; *Matthews*, 342 Ark. 566, 30 S.W.3d 92. Conduct will be considered serious misconduct if any of the following considerations apply:

(1) The misconduct involves the misappropriation of funds;

(2) The misconduct results in or is likely to result in substantial prejudice to a client or other person;

(3) The misconduct involves dishonesty, deceit, fraud, or misrepresentation by the lawyer;

(4) The misconduct is part of a pattern of similar misconduct;

(5) The lawyer's prior record of public sanctions demonstrates a substantial disregard of the lawyer's professional duties and responsibilities; or,

(6) The misconduct constitutes a "Serious Crime" as defined in these Procedures.

Procedures, Section 17(B).

Thus, we must now determine whether Mr. Newman's misconduct constituted serious misconduct warranting the sanction of disbarment as recommended by the special judge. We think it does and, therefore, agree with the recommendation of the special judge that under this court's Procedures, as well as our holding in *Price*, 360 Ark. 98, 200 S.W.3d 417, disbarment is warranted.

Mr. Newman argues that the special judge's interpretation of *Price* is too narrow, because disbarment is not automatically warranted simply because a case involves the misappropriation of

funds. Mr. Newman further argues that this court did not adopt the strict standard of disbarment enunciated by the New Jersey court.[6] We believe Mr. Newman's interpretation of the special judge's order is flawed. It is clear to us that the special judge recommended disbarment because of the serious nature of Mr. Newman's misconduct. In fact, in his order, the special judge points to the "strong unequivocal language found in Section 17(B)" in support of his recommendation for disbarment.

In light of the considerations set forth in Section 17(B), there can be no doubt that Mr. Newman's actions constituted serious misconduct. First, Mr. Newman's misconduct involved the misappropriation of funds. It is irrelevant that the primary victim of Mr. Newman's misconduct was his law firm. Procedure 17(B) leaves no room for distinguishing the type of victim of a misappropriation. Second, the misconduct resulted in prejudice to both the Barkasys and to Mr. Newman's firm. Next, Mr. Newman's conduct overwhelmingly involved deceit, dishonesty, and misrepresentation. Specifically, he deprived his firm of fees that it was entitled to and when confronted with his misappropriation concocted various methods to avoid detection or explain his misconduct. In addition, there was a pattern established whereby Mr. Newman wrongfully retained monies that did not belong to him. This was simply not a case of an isolated incident of failing to deposit clients' fees into his firm's account.

In sum, we would be remiss in our duty of protecting the public and the legal system if we were to ignore the overwhelming evidence of serious misconduct. We recognize that Mr. Newman presented much testimony about his admirable work in the community; however, his good deeds are clearly overshadowed by his consistent acts of serious misconduct. Accordingly, Mr. Newman's license to practice law in the State of Arkansas is hereby terminated.

## VIII. Clarification of Price

Finally, the Director requests that this court clarify its decision in *Price*, 360 Ark. 98, 200 S.W.3d 417, regarding the use of newly discovered information in the petition for disbarment.

---

[6] Mr. Newman's reference to the New Jersey court's standard stems from dicta in our *Price* opinion, wherein we discuss *In Re Wilson*, 81 N.J. 451, 409 A.2d 1153 (2002), and the New Jersey court's standards for disbarment.

Our review of this argument reveals that the Director is attempting to reargue the position he advanced in *Price* that was subsequently rejected by this court. Accordingly, we decline to review the merits of the Director's argument on this point.

Order of disbarment issued.