ROBIN F. WYNNE, Associate Justice
This is an original action under the Arkansas Supreme Court Procedures Regulating Professional Conduct. Stark Ligon, as executive director of the Arkansas Supreme Court Committee on Professional Conduct (Committee), seeks the disbarment of Bruce Jamison Bennett, an attorney licensed to practice law in the State of Arkansas. This court's jurisdiction lies pursuant to Arkansas Supreme Court Procedures Regulating Professional Conduct section 13(A).
In a ballot vote held on November 18, 2011, Panel A of the Committee unanimously found that Bennett had committed numerous violations of the rules governing the conduct of attorneys licensed to practice in Arkansas. The panel voted to initiate disbarment proceedings and to impose an interim suspension of Bennett's license to practice law. An order of interim suspension suspending Bennett's license during the pendency of the disbarment proceedings was entered on December 1, 2011. Ligon filed a complaint for disbarment on December 15, 2011. In a per curiam opinion issued on March 8, 2012, this court appointed the Honorable John Cole as special judge to preside over the disbarment proceedings. Ligon v. Bennett , 2012 Ark. 111, 2012 WL 745307.
The complaint for disbarment and the testimony at the trial centered on Bennett's representation of Darrell Cavanagh. The pertinent facts can be summarized as follows. Bennett operated a law firm in Bentonville that handled primarily criminal and domestic-relations matters. Cavanagh inherited a sum of money from his grandparents who resided in California. Cavanagh, who testified at trial that he is dyslexic and has a history of drug use, approached Bennett for assistance with the inheritance. Cavanagh expressed to Bennett an interest in investing his share of the money from the estate so that he would not spend it quickly. On January 22, 2003, Bennett and Cavanagh entered into an agreement under which Bennett would assist Cavanagh in "the remaining distribution of the estate of Thomas Cavanagh and Marguerite Cavanagh." In return, Bennett was to receive ten percent of all distributions from the estate issued to Cavanagh from the date of the agreement. Bennett was also to receive a 10 percent fee on all sums made or earned by Cavanagh from the investment of distributions received by Cavanagh.
*30 In February 2003, Bennett drafted and Cavanagh signed an authorization permitting Wells Fargo, the bank holding the estate funds, to transfer Cavanagh's funds into Bennett's IOLTA trust account. The following distributions were placed into Bennett's IOLTA account: $809,322.63 in April 2003; $100,000 in September 2003; $1,096.96 in October 2003; and $32,500 in November 2003. Bennett admitted that, throughout this period, he commingled client funds and other funds in his IOLTA account and wrote checks for personal and firm expenses out of the IOLTA account.
After Cavanagh expressed an interest in investing his money, Bennett introduced him to Ricky Hancock. Hancock and Bennett had played in a band together, and Bennett had represented Hancock in various legal matters. In April 2003, a corporation known as Hancock Holding Company, LLC, was formed. Ricky Hancock had a 60 percent ownership stake in Hancock Holding, with Cavanagh owning the remaining 40 percent. On April 11, 2003, Bennett prepared forms to create the Darrell Cavanagh Trust. Bennett utilized blank forms provided by Brad Lushbaugh, who represented Hancock in the loan negotiations. Bennett also drafted forms that granted him a springing durable power of attorney for financial purposes only, which were executed by Cavanagh on April 11, 2003.
On April 12, 2003, Hancock Holdings borrowed $745,000 from the Darrell Cavanagh Trust. Under the terms of the promissory note executed by Cavanagh and Ricky Hancock, the money was loaned at an interest rate of 2 percent per annum, with Hancock Holdings agreeing to pay the entire unpaid balance plus accrued and unpaid interest on or before May 1, 2013. Prior to that date, Hancock Holdings was required to pay accrued interest on a monthly basis. No monthly principal payment amount was listed. The loan was unsecured. A subsequent promissory note, executed on April 15, 2003, granted Hancock Holdings the unilateral right to extend the loan balance repayment date to April 15, 2023, with Hancock Holdings being responsible for interest-only payments prior to that date. The other material provisions of the original note remained unchanged.
Cavanagh testified at trial that he did not authorize any additional loans to Hancock Holdings. On February 25, 2005, Ricky Hancock executed a promissory note in which he agreed to pay Cavanagh $225,000 in exchange for Cavanagh's interest in Hancock Holdings. Cavanagh testified that he was not told that the payment was for the sale of his interest in the company. On May 2, 2005, Bennett wrote a $100,000 check out of his IOLTA account to Hancock Holdings. Bennett does not dispute that the funds were derived from Cavanagh's inheritance. According to Hancock's testimony, he obtained the additional funds by calling Bennett and telling Bennett that he needed money. Hancock Holdings subsequently dissolved, and Ricky Hancock declared bankruptcy. It is unclear how much of the loans were repaid, but the testimony makes it clear that a substantial portion of the loaned sums were not repaid. Cavanagh filed suit against Bennett, Hancock, and Hancock Holdings over the loans and failed venture. Cavanagh settled with Bennett for $17,000, which Cavanagh testified he received. Cavanagh obtained a $211,296.42 judgment against Hancock regarding the February 25, 2005 promissory note. Cavanagh's separate settlement with Hancock and Hancock Holdings required Hancock to make the mortgage payments on a home in Rogers. According to Hancock's testimony, that obligation was discharged in his subsequent bankruptcy. Hancock failed to make the payments, and Cavanagh lost the home in foreclosure.
*31 Cavanagh had a child-support obligation that preexisted his dealings with Bennett and continued throughout Bennett's representation of him. Cavanagh testified that he instructed Bennett to pay an existing arrearage and his ongoing obligation. Bennett countered that he was not aware of the obligation for some time and that Cavanagh did not instruct him to make child-support payments. The record contains child-support payment notices from Idaho and Arkansas that were addressed to Cavanagh and sent to Bennett's firm. Cavanagh testified that when he went to Idaho in early 2006 to visit his two children by a previous marriage, their mother informed him that she had not received support payments for some time. The failure to make payments resulted in a contempt sanction and body attachment that were resolved without assistance from Bennett. According to Mindy Cavanagh, Darrell Cavanagh's former spouse, the arrearage also negatively affected Darrell's credit. On April 13, 2006, Cavanagh wrote Bennett a letter in which he instructed Cavanagh to pay the child-support arrearage. In the letter, Cavanagh states that he had instructed Bennett on "numerous occasions" to pay his child support.
On May 16, 2006, Cavanagh terminated Bennett's representation via letter. In the letter, Cavanagh requested an accounting, a return of his money, and his files. According to Cavanagh, Bennett never returned any money and failed to return all of Cavanagh's files.
On March 16, 2016, the special judge issued findings of fact and conclusions of law in which he found that Bennett had committed violations of Rules 1.1, 1.2(a), 1.4(a)(1), 1.4(a)(3), 1.4(b), 1.5(a), 1.7(b), 1.15, 1.15(a)(1), 1.15(b)(1), 1.15(b)(3), 1.16(d), 3.3(a)(1), 3.3(a)(3), 8.4(b), and 8.4(c) of the Model/Arkansas Rules of Professional Conduct.[1] Following a separate hearing on the issue of the sanction to be imposed, the special judge determined that the appropriate sanction to be imposed is disbarment. Bennett has filed a brief with this court in which he contends that the special judge erred in finding that he had committed violations of the Model/Arkansas Rules of Professional Conduct.
In attorney-discipline proceedings, this court accepts the special judge's findings of fact unless they are clearly erroneous. Ligon v. Price , 360 Ark. 98, 200 S.W.3d 417 (2004). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. Ligon v. Newman , 365 Ark. 510, 516, 231 S.W.3d 662, 667 (2006). The court must view the evidence in a light most favorable to the decision of the special judge, resolving all inferences in favor of his or her findings of fact. Id. Disputed facts and determinations of the credibility of witnesses are within the province of the fact-finder. Id. The purpose of disciplinary actions is to protect the public and the administration of justice from lawyers who have not discharged their professional duties to clients, the public, the legal system, and the legal profession. Id.
Model Rule of Professional Conduct 1.1 required Bennett to provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation. The special judge found that *32 Bennett's conduct violated Rule 1.1, but he did not specify which conduct he believed violated the rule. Bennett's conduct in advising his client to enter into an unsecured loan at 2 percent interest with no monthly principal payments required and a possible twenty-year repayment date violates Rule 1.1. The same is true for Bennett's failure to pay Cavanagh's child-support obligation. We accept the special judge's finding that Bennett violated Rule 1.1.
Model Rule 1.2(a) required Bennett to abide by Cavanagh's decisions regarding the objectives of representation and consult with Cavanagh as to the means by which they were to be pursued. Cavanagh testified that he never authorized any loan to Hancock Holdings beyond the initial $745,000 sum. He also testified that he instructed Bennett to pay his child-support arrearage and ongoing obligation, which Bennett failed to do, even though the payment coupons were being sent to Bennett's firm. Bennett contended at trial that he gave the additional money to Hancock to hold for Cavanagh because he no longer felt comfortable having it in his IOLTA account. Hancock's testimony does not support that contention. Bennett also contended that he was never instructed to pay Bennett's child-support obligations and proffered evidence that, he argued, demonstrated that Cavanagh was unconcerned with the obligation. The special judge found that Bennett's conduct in investing additional funds after Cavanagh expressly told him not to do so and Bennett's failure to pay the child support arrearage and obligation violated Rule 1.2(a). Given the conflicting testimony, this issue comes down to credibility, and the special judge, who was present during the testimony, credited the testimony of Cavanagh and Hancock over Bennett. We accept this finding.
Arkansas Rule of Professional Conduct 1.4(a)(1) required Bennett to promptly inform Cavanagh of any decision or circumstance with respect to which Cavanagh's informed consent was required. The special judge found that Bennett had failed to get his client's consent before making additional loans. Bennett disputes the contention that unauthorized loans were made, but this is also a credibility issue that was resolved against Bennett by the special judge. We accept this finding.
Model Rule 1.4(a)(3) and Arkansas Rule 1.4(a)(3) both required Bennett to keep Cavanagh reasonably informed about the status of the matter. The special judge found that Bennett had violated these rules by failing to pay Cavanagh's child-support obligation, which resulted in either the issuance or near-issuance of a body attachment that had to be resolved with assistance from another attorney. Bennett was clearly aware of the child-support obligation, by virtue of the payment coupons being sent to his firm's address, and at a minimum, he failed to advise Cavanagh that he was not paying the obligation. We accept this finding.
Model Rule 1.4(b) and Arkansas Rule 1.4(b) both required Bennett to explain matters to the extent reasonably necessary to permit Cavanagh to make informed decisions regarding the representation. The special judge found that Bennett violated the rules by failing to adequately explain to Cavanagh that he was selling his interest in Hancock Holdings, considering Cavanagh's disability. The special judge also found that Bennett's failure to adequately explain the child-support situation constituted a violation of the rules. Bennett questions whether Cavanagh has a disability and contends that the evidence demonstrates that he did not learn of a potential disability until after the relevant documents *33 had been signed. Bennett also repeats his earlier arguments regarding Cavanagh's child-support issue. This finding presents another credibility issue that the special judge resolved against Bennett. We accept this finding.
Model Rule 1.5(a) required Bennett's fees to be reasonable. The factors to be considered in determining the reasonableness of a fee include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.
The special judge found that Bennett's fee agreement violated Rule 1.5. As stated above, under the agreement, Bennett was entitled to receive 10 percent of Cavanagh's disbursements from his grandparents' estate, plus an additional 10 percent of any income Cavanagh realized from investment of the distributed amounts in which Bennett may have been involved. At the time the agreement was executed, there was no indication that anyone contended Cavanagh was not entitled to a share of his grandparents' estate. It was simply a question of how much he would receive and when he would receive it. Thus, there is little, if anything to justify Bennett's entitlement to 10 percent of Cavanagh's distributions. While Bennett is certainly entitled to be compensated for his time, under the agreement, he was entitled to receive approximately $80,000-90,000 in exchange for what amounted to writing a series of letters to Wells Fargo with no litigation, or even the possibility of litigation, being necessary to obtain the funds. This is not reasonable. Bennett contends that he did a large amount of work for Cavanagh. While that may be correct, the fee agreement itself did not require him to do any work other than obtain the funds from the estate in order to be entitled to 10 percent of the distributions. There was no written agreement between the parties that contemplated any additional services to be provided by Bennett in exchange for his fee. Because it was clear from the outset that the work contemplated under the fee agreement would not be sufficiently substantial to justify the amount of the fee, we accept the finding by the special judge that the fee agreement violated Rule 1.5(a).
Model Rule 1.7(b) prohibited Bennett from representing a client if the representation of that client was materially limited by his responsibilities to another client, a third party, or his own interests. The special judge found that Bennett's action in advising Cavanagh to enter into a loan agreement for $745,000 with Bennett's friend and former client under terms that were unfavorable to Cavanagh violated Rule 1.7. Although Cavanagh and Hancock were represented by separate counsel during the loan negotiations, Bennett did have personal and professional ties to Hancock of which Cavanagh stated he was unaware at the time. The special judge's finding on this point is bolstered by Bennett's later actions in loaning Hancock additional money with a simple phone call being all that was required. We accept this finding.
Bennett admitted commingling client and personal funds in his IOLTA
*34 trust account. This is a clear violation of Model Rule 1.15 and Arkansas Rule 1.15, which require attorneys to hold client property separate from their own property, with client funds required to be held in a separate, clearly identifiable trust account. The special judge also found that Bennett's actions constituted misappropriation from his IOLTA account and involved dishonesty, deceit, fraud, or misrepresentation warranting disbarment. Bennett disputes the latter finding, arguing that, while he did keep personal funds in his IOLTA account, it was a simple matter for him to check his records and determine what was client money and what was not. Our review of the financial records submitted at trial reveals no proof that Bennett took money belonging to his clients. It does not appear that his account ever dropped below what would have been required to cover Cavanagh's disbursements, which are the only client funds that were proved to be in the account. We accept the finding of violations of Model Rule 1.15 and Arkansas Rule 1.15, but we do not accept the finding of misappropriation of client funds, as proof of misappropriation is absent from the record.
The special judge also found that Bennett's mishandling of his IOLTA trust account violated Model Rule 8.4(b) and Arkansas Rule 8.4(b), which both state that it is professional misconduct for an attorney to commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects. Although Bennett clearly commingled funds, petitioner has failed to prove theft or any other criminal conduct in connection with Bennett's handling of his IOLTA trust account. We conclude that the special judge's finding of a violation of Model Rule 8.4(b) and Arkansas Rule 8.4(b) is clearly erroneous and we do not accept it.
Arkansas Rule 1.16(d) states,
Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.
Cavanagh testified that Bennett failed to provide him with an accounting of his money and provided him with only a "small box" after he requested his files and documents. The special judge found that Bennett's actions violated Rule 1.16(d). Bennett disputes the finding, but the special judge credited Cavanagh's testimony that a complete accounting was not provided and his files were not returned. We accept this finding.
Arkansas Rule 3.3(a)(1) prohibits a lawyer from making a false statement of fact or law to a tribunal. It also prohibits a lawyer from failing to correct a false statement of fact or law he or she previously made to the tribunal. Rule 3.3(a)(3) prohibits a lawyer from offering evidence the lawyer knows to be false. In both his responsive pleading and his deposition during the litigation initiated by Cavanagh that was later settled, Bennett stated that attorney Brad Lushbaugh drafted the estate-planning documents for Cavanagh and the Darrell Cavanagh Trust. During his disbarment trial, Bennett testified that Lushbaugh provided him with blank estate-planning forms that he completed and provided to Cavanagh. The special judge found that Bennett's statements prior to the disbarment trial violated Rules 3.3(a)(1) and (3). The special judge *35 also found that Bennett's actions involved dishonesty, deceit, fraud, or misrepresentation warranting disbarment. Bennett responds that he never indicated that Lushbaugh represented Cavanagh, nor did he intend to mislead by making the statements. There is a material difference between "drafting" forms and providing blank forms to be completed, and an attorney is expected to be aware of that difference. There is evidence in the record that Bennett's statements in the earlier pleading and deposition were false statements of fact. We accept the finding of a violation by the special judge.
The special judge found that Bennett's conduct in violating several of the other rules constituted violations of Model Rule 8.4(c) and Arkansas Rule 8.4(c), which both state that it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. There is evidence that Bennett counseled his learning-disabled client to engage in a $745,000 unsecured loan to Bennett's friend at 2 percent interest. There is also evidence that Bennett later loaned his friend substantial additional sums against his client's express wishes. This is evidence of conduct involving fraud, deceit, or misrepresentation. We accept the finding that Bennett violated Model Rule 8.4(c) and Arkansas Rule 8.4(c).
Having accepted findings by the special judge that Bennett committed violations of the rules, we must determine the appropriate sanction for those violations. Bennett himself admitted at the sanction hearing that the evidence was sufficient for disbarment, stating, "You want to disbar, there's more than enough evidence to do it." He offers no argument in his brief in response to the special judge's recommended sanction of disbarment.
The special judge found that Bennett had engaged in serious misconduct, which is defined in section 17B of the Procedures Regulating Professional Conduct as "conduct in violation of the Rules [of Professional Conduct] that would warrant a sanction terminating or restricting the lawyer's license to practice law." Pursuant to section 17B, conduct will be considered serious misconduct if any of the following considerations apply:
(1) The misconduct involves the misappropriation of funds;
(2) The misconduct results in, or is likely to result in, substantial prejudice to a client or other person;
(3) The misconduct involves dishonesty, deceit, fraud, or misrepresentation by the attorney;
(4) The misconduct is part of a pattern of similar misconduct;
(5) The attorney's prior record of public sanctions demonstrates a substantial disregard of the attorney's professional duties and responsibilities; or
(6) The misconduct constitutes a "Serious Crime," as defined in these Procedures.
While the special judge found that Bennett had misappropriated funds, as stated above, we do not accept that finding. The special judge found that certain instances of misconduct committed by Bennett involved dishonesty, deceit, fraud, or misrepresentation, and we have accepted certain of those findings. Cavanagh was clearly prejudiced by Bennett's conduct, as he lost the bulk of his inheritance through his dealings with Bennett and Hancock. Bennett's prior disciplinary history includes one caution, three reprimands, and three suspensions, for three, six, and nine months respectively.
Given Bennett's history, the findings from the disbarment hearing, and Bennett's admission during the sanctions hearing, *36 we adopt the special judge's recommended sanction of disbarment.
Order of disbarment issued.
Special Justice Robert Hudgins concurs.
Baker, J., not participating.
Special Justice Robert Hudgins concurs.
I would join with the majority opinion but have significant concerns regarding the Trial Court's findings. There was a line from a movie in the early 1990's called, "He Said, She Said." It was a movie about male and female television opinion show hosts. Their show was a pre-curser to today's Fox and MSN news but they operated on a point, counter-point premise and the male would sometimes end his argument with the following:
"Like my old Uncle Olaf used to say, 'This just smells bad, and I'm not going to eat it.' "
I'm not exactly to the point where I'm not going to eat it, but certainly there are items in the Trial Court's findings that do not set right with me. I take my role seriously as a reviewing court and as a practicing attorney who is bound by only those items that I can prove as opposed to what I speculate that I might have proved. The majority affirmed several of the Trial Court's findings that came down to a credibility issue where the Court sided with the Complainant, Darrell Cavanagh.
"In attorney-discipline proceedings, this court accepts the special judge's findings of fact unless they are clearly erroneous. Ligon v. Price , 360 Ark. 98, 200 S.W.3d 417 (2004). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. Ligon v. Newman , 365 Ark. 510, 516, 231 S.W.3d 662, 667 (2006)."
I am definitely left with a most firm conviction that a mistake has been committed.
I can't assign any credibility whatsoever to Darrell Cavanagh. Any issue that pits his credibility against anyone else, in my opinion, is contrary to the facts. This is a man with multiple felony convictions whose testimony was wholly unreliable. Every single thing that he testified to on direct, he countered on cross. I mean everything. That in itself should render his testimony unreliable. But add that to his criminal past, his extensive admitted drug use and the fact that he lied to the Petitioner during this investigation on multiple occasions regarding a non-existent diagnosis of cancer. I would not affirm on any issue that came down to his credibility.
As to the issue of Respondent's failure to make Cavanagh's child support payments. I restate all of the above as to Mr. Cavanagh's credibility and add that actions have to speak louder than words. This is a man that made close to $100,000.00 a year working on fishing boats in Alaska and never paid a dime of child support. Before he ever appeared to the Respondent, he owed over $20,000.00 in child support. Before he came to Mr. Bennett, he had received $140,000 and did not pay a dime of child support. Respondent received $809,000.00 on behalf of Mr. Cavanagh and paid his outstanding bills that he had run up in a very short period of time, leaving $745,000.00 to invest. None of the $809,000.00 went toward any child support at Mr. Cavanagh's directions. Then for a period of three years, he had all of his expenses paid and a stipend of $3,500 a month, many months getting twice that amount because he had already blown through the money. In the first year and one-half alone, he received $250,000.00 from a $745,000.00 note to be paid monthly at two percent interest. Yet, again, not a dime went to his child support. In late *37 2005 upon getting out of jail, he received $100,000.00 and again nothing went to child support. He received $20,000.00 to open a business with another convicted felon, who promptly wasted all of the money and, again, nothing went to child support. The Trial Court found and the majority affirmed that Respondent had a duty to pay child support because he was asked by Mr. Cavanagh. Respondent testified that he didn't know Mr. Cavanagh had children until 2004, which is backed up by the vouchers that started coming to his office. I can assign no credibility to Darrell Cavanagh and very little to Mr. Bennett. However, Mr. Bennett's secretary, Kara Morgan, testified that Cavanagh would come to the office daily and advise her which bills to pay with directions not to pay support. That probably comes closer to the truth than anything. As such, I would not affirm the Trial Court's findings on anything having to do with the Respondent having an obligation to pay child support. Thus, I find no violation of Rule 1.1 nor 1.4(a)(3) in connection to support.
Typically, our Courts have disbarred attorneys for gross incompetence, theft, a combination of the two or multiple violations. My problem is when reviewing the record several findings are not supported by the facts. For example, there is a finding that the Respondent filed a false pleading as to preparation of documents in a related matter and testified in a deposition falsely as to the preparation of those documents. Perhaps Panel A in making their findings were provided that evidence but for certain in this record there was no testimony as to that type of violation. There were no copies of the pleadings submitted as evidence and there was no portion of the deposition submitted into evidence. As such, I find it puzzling that the Petitioner wants to disbar a man for violations of the ethical rules yet submits a finding that is not supported by the record. I see no violation of Rule 3.3(a)(1) and 3.3 (a)(3).
The Court's finding is replete with descriptions of Darrell Cavanagh's mental abilities, from anything that he was dyslexic, to "given Cavanagh's cognitive limitations," to a learning-disabled client. I suppose the Petitioner could argue that I didn't have the opportunity to observe Cavanagh during this matter and that perhaps I should leave that to the trier of fact. However, the actions complained of happened between 2003 and 2006 and the trial occurred in 2015. There is not one shred of medical evidence as to any medical problems of Cavanagh and more than likely his extensive drug use played a part in any cognitive ability. But again, that was ten years earlier. Wouldn't the more prudent way to prove that have been to submit medical evidence of Cavanagh's disabilities from 2003 to 2006? In fact, the only evidence mentioning medical records is the Respondent pointing out that he secured medical authorizations after the primary documents were signed, which is backed up by the documents that were introduced, sent those authorizations to the facilities where Cavanagh stated he had been treated and all of the responses came back that they had never heard of him. This lends credence to my finding that Cavanagh has absolutely no credibility whatsoever. In a disbarment proceeding for our Courts to place reliability and credibility on such a source is a dangerous precedent.
The Trial Court found that Mr. Bennett had violated Rule 1.1(6)(d) based purely upon Mr. Cavanagh's statement that Mr. Bennett failed to provide him with an accounting of his money and only provided him a "small box" after he requested his files and documents. How about a modicum of evidence. What is "small box?" On a previous appointment as Special Justice the entire appeal was sent to me in a *38 "small box." I have all the exhibits and pleadings from this matter in a "small box." How about a little bit of something in the record that it was a shoe box or copy paper box or a box that was 1 ft. x 2 ft.? To make a finding of a violation of a rule based upon the wholly unreliable testimony of Mr. Cavanagh and then no description whatsoever of what was and was not provided to him, again, is a troubling precedent to me. I do not think lawyers should take advantage of clients, but I do not think our governing body should make findings based upon a unreliable client's testimony and that is exactly what Mr. Cavanagh appears to be. He sees this as a game. He even sued the attorneys that represented him against Mr. Bennett. If you recall, he testified that Mr. Bennett kept him apprised at all times of the amounts in the accounts and what was spent. Now, he claims he didn't receive an accounting. Once again, his own testimony conflicts with the findings. If we are to believe his testimony over somebody else's, which one of his statements are we to believe? As such I see no violation of Rule 1.1(6)(d).
My only other pause is that Mr. Bennett does have a prior bad history of misconduct. My pause on that is that all of those actions occurred after these actions. He was previously cited in the 2009-2011 period. Now we are citing him for violations from 2003-2006. So in a sense, we are saying that as to the items that happened first, we are going to disbar him because he has a history of things that happened afterwards. Maybe this is where Uncle Olaf comes in! Why did this proceeding take nine (9) years to make its way through the courts? Having said that, I do find troubling that one of the prior issues of misconduct was when Mr. Bennett lied to a trial judge about the whereabouts of his client after he told his client to leave the hearing.
Most troubling to me regarding all of these findings that in my opinion were not supported by the record is they were not needed. Mr. Bennett admitted and it was pointed out by the majority that we have enough evidence to disbar him. Perhaps that was his point. Perhaps he was trying to say that several of the allegations made against him were not true. I would affirm on his admissions alone, but there are three (3) primary reasons for the finding of disbarment to stand:
No. 1-the employment contract that he prepared and signed with Darrell Cavanagh was wrong. There is not a lot of proof in the record that he actually was paid the amounts he contracted for and as the majority points out he did additional work for Mr. Cavanagh. However, the contract as written takes advantage of a client, which we cannot have.
No. 2-Mr. Bennett essentially used his IOLTA account as his primary account. The majority correctly found there was not any proof that he had taken money from Mr. Cavanagh perhaps at least partially on the fact that Mr. Bennett's record keeping was incomplete. Respondent classified it as that he was sloppy. That type of sloppiness is also inexcusable. He co-mingled hundreds of thousands of dollars of his money and client's money without reasonable explanations or accountings and it is just something that an attorney cannot do. I suspect that if better evidence was presented at trial there were quite possibly further violations of our ethical code, but this is gross incompetence and a substantial disregard of the attorney's professional duties and responsibilities.
No. 3-Mr. Bennett took $100,000.00 of Mr. Cavanagh's money and invested it without his permission. It does appear from the evidence that Mr. Cavanagh did not lose that money and that it was repaid *39 to him. I do not believe Mr. Cavanagh told him not to invest other funds, but Mr. Bennett admits that he was not authorized to invest the money. Attorney's cannot be giving $100,000.00 of client's money to another source without the client's permission.
Those items are more than enough evidence to affirm the Trial Court's findings. Thus, I find it troubling that there were far too many other findings of the Trial Court that were not supported by the record and they should not be affirmed. Even if they are true the Petitioner had a duty to prove them by providing evidence not conjecture. I concur with the overall findings but not specific finding as set forth above.

Both the Model Rules of Professional Conduct and the Arkansas Rules of Professional Conduct are implicated here because the Model Rules were adopted by this court via per curiam order dated December 16, 1985, and were replaced by the current Arkansas Rules effective May 1, 2005. In re Ark. Bar Ass'n , 361 Ark. App'x 451.